RED ARROW PRODUCTS COMPANY, INC., Plaintiff-Appellant,†

v.

EMPLOYERS INSURANCE OF WAUSAU, A Mutual Company, Defendant-Respondent.

Court of Appeals

*No. 98–3628. Submitted on briefs September 23, 1999.—Decided January 19, 2000.*

## 2000 WI App 36

(Also reported in 607 N.W.2d 294.)

†Petition to review denied.

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Gary L. Bendix* and *John M. Bruce* of *Savage, Gregorski, Webster, Stangel, Bendix & Bruce, S.C.* of Manitowoc.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Scott J. Ryskoski* and *Roger B. Frederickson* of *Larson King, LLP* of St. Paul, Minnesota; and *Michael J. Cohen* of *Meissner, Tierney, Fisher & Nichols, S.C.* of Milwaukee.

Before Brown, P.J., Nettesheim and Snyder, JJ.

¶ 1.  SNYDER, J.   Red Arrow Products Company, Inc. (New Red Arrow) appeals from an order dismissing its action requesting a declaration of the duty of Employers Insurance of Wausau (Wausau) to defend and/or indemnify New Red Arrow under liability policies issued by Wausau to New Red Arrow's predecessor. New Red Arrow contends that, by operation of law, it was transferred the benefits of Wausau's policies which were in effect prior to New Red Arrow's existence. We conclude that because New Red Arrow was not a named insured and was never assigned the policies, it does not have coverage under the policies as a matter of contract law. We therefore affirm the trial court's order granting Wausau's motion for summary judgment.

## BACKGROUND

### Old and New Red Arrow

¶ 2.   The history of New Red Arrow and its predecessors is somewhat confusing, but the essential facts are as follows. Prior to July 1970, Red Arrow Products Corporation, a Wisconsin corporation, was engaged in

the food flavoring business at the same location in Manitowoc presently occupied by New Red Arrow. Red Arrow Products Corporation changed its corporate form to a general partnership in July 1970 and continued operations as Red Arrow Products Company, a general partnership. In September 1981, Red Arrow Products Company, a general partnership, transferred its assets to Red Arrow Products Company, a Delaware corporation, in return for all of the issued stock of the Delaware corporation; the Delaware corporation was formed to continue the manufacturing and sales operations of Red Arrow Products Company, a general partnership. At the same time, Red Arrow Products Company, a general partnership, changed its name to Red Arrow Partnership and continued to operate as an investment company.

¶ 3.   In May 1984, Red Arrow Products Company, a Delaware corporation, transferred and assigned certain of its assets and liabilities to New Red Arrow. After the sale, Red Arrow Products Company, a Delaware corporation, changed its name to TO-WE-TI Company, a general partnership, which was then dissolved and its assets distributed to Red Arrow Partnership on December 31, 1984. For our purposes, we will refer to the preceding entities, except for New Red Arrow, as Old Red Arrow (i.e., Red Arrow Products Corporation, a Wisconsin corporation; Red Arrow Products Company, a general partnership; Red Arrow Products Company, a Delaware corporation; TO-WE-TI Company, a general partnership; Red Arrow Partnership).

## The Wausau Policies

¶ 4.   Wausau issued primary and umbrella comprehensive general liability insurance policies (the

Wausau policies) to Old Red Arrow. Under the Wausau policies, Old Red Arrow was an insured for policy periods commencing on April 1, 1969, and terminating on July 1, 1977. The declarations page of each of the policies identifies the named insured as "Red Arrow Products Company," which is further identified as a partnership.[1]

¶ 5. The Wausau policies generally provide that Wausau "will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of . . . bodily injury or . . . property damage." Wausau also has the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage.

¶ 6. The Wausau policies define an "insured" as "any person or organization qualifying as an insured in the 'Persons Insured' provision of the applicable insurance coverage." The "Persons Insured" section sets forth who is an insured under the policies:

> Each of the following is an insured under this insurance . . .
>
> . . . .
>
> (b)  if the named insured is designated in the declarations as a partnership or joint venture, the partnership or joint venture so designated and any partner or member thereof but only with respect to this liability as such.

---

[1] The only exceptions are the first two primary Wausau policies, in effect for annual policy periods from April 1, 1969, to April 1, 1971, which list "Wisconsin Malting Corp." as the named insured and include "Red Arrow Products Corp." as an "additional named insured" by way of endorsement.

The Wausau policies also contain a provision addressing the assignment of a policy. "Assignment of interest under this policy shall not bind [Wausau] until its consent is endorsed hereon . . . ."

¶ 7. The assets transferred from Old Red Arrow to New Red Arrow at the time of the May 1984 purchase and sale agreement (sale agreement) were identified as the "Purchased Assets." These assets included the accounts, contracts, customer lists, inventory, investments and insurance policies, among other things. The term "Insurance Policies" was set forth in the sale agreement as "all of the insurance policies owned by [Old Red Arrow] and which are listed on Exhibit 9." Exhibit 9 apparently identified a current comprehensive general liability policy held by Old Red Arrow, but it did not list the Wausau policies. New Red Arrow does not dispute that the Wausau policies were not mentioned in Exhibit 9 of the sale agreement and that the Wausau policies were not included in the sale. The sale agreement stated that the liabilities of Old Red Arrow to be assumed by New Red Arrow under the terms of the sale agreement included "liabilities and obligations of [Old Red Arrow] relating to accounts payable, payroll, bonus, commissions, real estate taxes, personal property taxes, payroll taxes and volume discounts."

## The Lemberger Sites

¶ 8. From 1972 to 1976, Old Red Arrow disposed of wood tar waste at the Lemberger Landfill and Lemberger Landfill Transport and Recycling Sites (the Lemberger sites). In 1984 and 1985, the Lemberger sites were added to the United States Environmental Protection Agency's (EPA) National Priorities List, created pursuant to the Comprehensive Environmental

Response, Compensation, and Liability Act of 1980 (CERCLA), 42 U.S.C. § 9605(a)(8)(B) (West 1995). In November 1985, the EPA notified New Red Arrow that it considered Red Arrow, without designating New or Old, to be a potentially responsible party with respect to the remediation of the Lemberger sites.

¶ 9. Wausau later agreed to advance funds to Old Red Arrow to pay the costs of the investigation to verify the nontoxic or nonhazardous contribution of the wood tar wastes at the Lemberger sites.

¶ 10. In October 1992, the EPA entered into a consent decree with a potentially responsible parties group called the Lemberger Site Remediation Group (LSRG). The LSRG did not initially include New or Old Red Arrow. New Red Arrow subsequently began negotiations with the LSRG to enter into a settlement agreement. In November 1993, New Red Arrow notified Wausau that it believed Wausau owed it a defense and had a duty to indemnify it under the Wausau policies. In February 1994, New Red Arrow entered into a participation agreement with the LSRG. New Red Arrow then filed suit against Old Red Arrow seeking recovery of costs pertaining to the environmental cleanup of the Lemberger sites. Wausau initially provided a defense for Old Red Arrow in that action.

¶ 11. In June 1995, the EPA filed a federal action against New Red Arrow to recover costs incurred with respect to the Lemberger sites. New Red Arrow tendered the defense of the action to Wausau, but Wausau denied its request. New Red Arrow later settled with the EPA, agreeing to pay $712,500 for costs incurred with respect to the Lemberger sites.

¶ 12. In May 1997, New Red Arrow commenced this action seeking a determination of Wausau's duty to defend and indemnify it under the Wausau policies

for claims arising out of its alleged liability concerning disposal of wastes at the Lemberger sites. Both parties filed motions for summary judgment. On July 16, 1998, the trial court rendered its decision, granting Wausau's motion and dismissing New Red Arrow's declaratory judgment action.

## DISCUSSION

¶ 13. When reviewing a grant of summary judgment, this court applies the standards of WIS. STAT. § 802.08 (1997–98)[2] in the same way the trial court applied them. *See Amcast Indus. Corp. v. Affiliated FM Ins. Co.*, 221 Wis. 2d 145, 153, 584 N.W.2d 218 (Ct. App.), *review denied*, 221 Wis. 2d 654, 588 N.W.2d 631 (Wis. Oct. 14, 1998) (No. 96–2968). For summary judgment to be granted, there must be no genuine issue of material fact and the movant must be entitled to judgment as a matter of law. *See* § 802.08(2). The court must examine the pleadings to determine whether a claim has been stated and whether there are any material issues in dispute. *See Amcast*, 221 Wis. 2d at 154. An appellate court reviews an interpretation of an insurance policy as a matter of law, paying no deference to the lower court. *See id.* at 153–54.

¶ 14. Wausau and New Red Arrow have stipulated to the material facts; we therefore move on to address the contested legal issues. Initially, the parties dispute the question presented in this case. New Red Arrow states that two issues are at stake: whether New Red Arrow was entitled to a defense by Wausau and whether the duty to indemnify under the Wausau poli-

---

[2] All references to the Wisconsin Statutes are to the 1997–98 version.

cies issued to Old Red Arrow is owed to New Red Arrow. New Red Arrow's appeal focuses on whether it is at least "fairly debatable" that the benefits under the Wausau policies were transferred to it by operation of law. It argues that Wausau had a duty to defend New Red Arrow which it failed to meet without first seeking a determination regarding coverage.

¶ 15. Wausau contends that the issue is a more narrow one which is found in the trial court's scheduling order and asks whether New Red Arrow can claim coverage under policies issued by Wausau to New Red Arrow's predecessor. In February 1998, the parties agreed for purposes of summary judgment to stipulate to certain facts concerning the "threshold issue," which was similarly defined as "whether [New Red Arrow] has any right to claim benefits as though it is an insured under certain liability insurance policies issued by [Wausau] to [Old Red Arrow]." In addition, at the summary judgment motion hearing, the court stated that the "issue at this particular time is a very narrow one, . . . the issue . . . is who is insured under these policies that were issued back in the 70's to [New Red Arrow's] predecessor." The court then determined that New Red Arrow was not an insured under the Wausau policies because, among other things, there was no assignment of the policies from Old Red Arrow to New Red Arrow. We are convinced that the question in this case is the one the parties have been addressing from the start and which has not changed since the parties' arguments for summary judgment: whether New Red Arrow is an insured under the policies.

¶ 16. Next, New Red Arrow urges us to extend the "fairly debatable" standard, which Wisconsin law presently applies to determine the issue of coverage and the duty to defend, *see Elliott v. Donahue*, 169 Wis.

2d 310, 317, 485 N.W.2d 403 (1992), to answer the question of who is an insured. New Red Arrow contends that because the question of who is entitled to the benefits of an insurance policy is a coverage issue just as the question of whether a particular claim is covered is a coverage issue, the "fairly debatable" standard should apply to both. New Red Arrow is unable to point to any case in which the issue of whether a party is an insured is addressed by the "fairly debatable" standard but, nonetheless, asks that we utilize the standard in this case. We decline New Red Arrow's request.

¶ 17.   The principal benefits provided under an insurance policy are indemnification and defense. *See Elliott*, 169 Wis. 2d at 320. An insurer's duty to defend is broader than its duty to indemnify because the duty to defend exists when it is merely arguable that the policy in question provides coverage. *See Radke v. Fireman's Fund Ins. Co.*, 217 Wis. 2d 39, 44, 577 N.W.2d 366 (Ct. App.), *review denied*, 219 Wis. 2d 923, 584 N.W.2d 123 (Wis. May 18, 1998) (No. 97–0044). An insurer has a duty to defend if the existence of coverage is fairly debatable. *See id.* A claim is fairly debatable where a genuine dispute over the status of the law or the facts exists at the time of the tender of defense. *See Madsen v. Threshermen's Mutual Ins. Co.*, 149 Wis. 2d 594, 614, 439 N.W.2d 607 (Ct. App. 1989). Although the "fairly debatable" standard is measured from the insurer's point of view, the policy language is still tested not by what the insurer intended the words to mean, but by what a reasonable person in the position of the insured would have understood the words to mean. *See United States Fire Ins. Co. v. Good Humor Corp.*, 173 Wis. 2d 804, 820, 496 N.W.2d 730 (Ct. App. 1993).

¶ 18.   The "fairly debatable" standard defines the scope of an insurer's duty to defend by addressing whether there is arguable coverage; the standard presumes that the identity of the insured has been established. The *Elliott* court noted that "[t]he insurer that denies coverage and forces *the insured* to retain counsel and expend additional money to establish coverage for a claim that falls within the ambit of the insurance policy deprives *the insured* the benefit that was bargained for and paid for with the periodic premium payments." *Elliott*, 169 Wis. 2d at 322 (emphasis added). When faced with a claim for which coverage is fairly debatable, an insurer is instructed to obtain a judicial determination of its coverage obligations, if any. *See Fire Ins. Exch. v. Basten*, 202 Wis. 2d 74, 89–90, 549 N.W.2d 690 (1996). "An insurer may need to provide a defense to its insured when the separate trial on coverage does not precede the trial on liability and damages." *Mowry v. Badger State Mut. Cas. Co.*, 129 Wis. 2d 496, 528, 385 N.W.2d 171 (1986). Placing such requirements on an insurer helps guarantee that the insured receives the protection which it believed it was purchasing with its premium payments. The "fairly debatable" standard is instrumental to the insured's protection.

¶ 19.   Here, New Red Arrow did not come into existence until 1984 and therefore was not a named insured on the Wausau policies. New Red Arrow cannot obtain the benefit of the "fairly debatable" standard in arguing that Wausau had a duty to defend because it did not bargain for the Wausau policies and did not pay the premiums. We therefore refuse to apply the "fairly debatable" standard in this case.

125

¶ 20.   Besides not being a named insured, New Red Arrow was never assigned the Wausau policies under its sale agreement with Old Red Arrow. The sale agreement gave New Red Arrow the "Purchased Assets," but these assets did not include the Wausau policies. New Red Arrow does not dispute this fact.

¶ 21.   In addition, the Wausau policies' assignment provision precludes assignment without the insurer's consent. "Assignment of interest under this policy shall not bind [Wausau] until its consent is endorsed hereon . . . ." This language makes clear that without Wausau's permission, no assignee or transferee has any rights to any benefits under the Wausau policies. *See Loewenhagen v. Integrity Mut. Ins. Co.*, 164 Wis. 2d 82, 92, 473 N.W.2d 574 (Ct. App. 1991) ("no assignment" provision clearly precluded transfer of automobile insurance policy from seller of automobile to buyer where no consent was obtained). New Red Arrow does not dispute the policy language.

¶ 22.   Instead, New Red Arrow contends that the benefits of the Wausau policies were transferred to it by operation of law. In support, New Red Arrow relies upon *Northern Insurance Co. v. Allied Mutual Insurance Co.*, 955 F.2d 1353 (9th Cir. 1992), *cert. denied*, 505 U.S. 1221 (1992), and subsequent cases, which concluded that the benefits of insurance policies can transfer from one business entity to a succeeding entity despite there being no assignment of the policies.

¶ 23.   In *Northern Insurance*, the underlying action was a products liability suit brought by the Howards against the makers of California Cooler after their child was born with fetal alcohol syndrome. The Howards later voluntarily dismissed their suit. Before the Howards filed suit and after their child was born, Brown-Forman bought California Cooler through an

asset purchase agreement. The agreement excluded from the sale the assignment of any contract or insurance policy that required consent to assign. Allied Mutual Insurance had issued California Cooler a products liability policy which was in effect during Mrs. Howard's pregnancy but which did not appear on the list of insurance policies transferred to Brown-Forman.

¶ 24. The Ninth Circuit Court of Appeals first determined that the parties' purchase agreement did not assign Allied Mutual's policy to Brown-Forman because the agreement specifically excluded any contract that required consent to be assigned and Allied Mutual's policy required California Cooler to obtain its consent before assigning the policy. See id. at 1357. The court, however, concluded that the benefits of Allied Mutual's policy were transferred by operation of law under California's and Washington's "rule of product-line successor liability." Id. In the California case of *Ray v. Alad Corp.*, 560 P.2d 3 (Cal. 1977), the court created the product-line successor liability rule as an exception to the rule against successor liability.[3] The product-line successor liability rule provides that a purchaser of a firm's assets assumes the obligation for product liability claims arising from the selling firm's

---

[3] As a general rule, a corporation purchasing the assets of another corporation will not be liable for obligations of the selling corporation. There are four well-recognized exceptions, however, to the rule against successor liability: (1) when the purchasing corporation agrees to assume the obligations, (2) when the transaction amounts to a merger of the two corporations, (3) when the purchasing corporation is merely a continuation of the selling corporation, and (4) when the transaction is fraudulently contracted to escape such liability. See *Sedbrook v. Zimmerman Design Group, Ltd.*, 190 Wis. 2d 14, 20, 526 N.W.2d 758 (Ct. App. 1994).

presale activities, regardless of any clause to the contrary in the asset purchase agreement. *See id.* at 11. The *Northern Insurance* court applied this product-line successor liability rule to the insurance policy at issue.

> The district court found that the right to indemnity arising from California Cooler's policy transferred together with the potential liability. This right to indemnity followed the liability rather than the policy itself. As a result, even though the parties did not assign Allied's policy in the agreement, the right to indemnity under the policy transferred to Brown-Forman by operation of law.

*Northern Insurance*, 955 F.2d at 1357. The court explained that the rationale for honoring "no assignment" or consent clauses no longer exists when liability arises from presale activity. *See id.* at 1358.

¶ 25.   Next, New Red Arrow finds support for extending the product-line successor liability rule to cases involving CERCLA liability. New Red Arrow cites *Total Waste Management Corp. v. Commercial Union Insurance Co.*, 857 F. Supp. 140 (D.N.H. 1994), and *B.S.B. Diversified Co. v. American Motorists Insurance Co.*, 947 F. Supp. 1476 (W.D. Wash. 1996). We will address each in turn.

¶ 26.   In the first case, Total Waste Management (TWM) brought a declaratory action against Maine Bonding & Casualty Co. to determine whether it had an obligation to defend and indemnify TWM in an action brought by Kleen Laundry and Dry Cleaning Services, Inc. for costs incurred in responding to an environmental hazard. *See Total Waste Management*, 857 F. Supp. at 142. Kleen filed its underlying action against several oil recycling companies, including George West, claiming that TWM was a successor to George West. Maine Bonding sought summary judg-

ment against TWM, arguing that TWM was not a named insured on the policy issued to George West, nor an insured of Maine Bonding as a result of TWM's purchase of assets from George West, nor an assignee of the George West policy. In denying Maine Bonding's motion, the Federal District Court of New Hampshire held that

> [w]hile agreeing that *Northern Ins. Co.* is a product-line successor liability case, the court finds the Ninth Circuit's reasoning is persuasive authority in deciding whether a potential corporate successor is entitled to coverage under its predecessor's insurance policy for a risk occurring before the transfer of assets.

*Id.* at 152.

¶ 27. The second case, *B.S.B. Diversified,* also involved liability for environmental cleanup costs. B.S.B. obtained all of the assets and assumed all of the liabilities of the previous owners of contaminated property. The term of insurance coverage at issue was for a period prior to the sale of B.S.B. The court stated that although the liability was assigned by contract to B.S.B., as successor, the principle that insurance follows liability was equally valid in the present case as in a products liability case like *Northern Insurance. See B.S.B. Diversified,* 947 F. Supp. at 1481. The court concluded that the holding in *Northern Insurance* should apply in CERCLA cases as in products liability cases. "If the law holds the successor liable for its predecessor's tortious acts—no matter the nature of those acts—then the law likewise transfers the insurance benefits covering liability for those acts to the successor." *Id.* at 1481–82 (quoting *Quemetco v. Pacific Auto.*

*Ins. Co.*, 29 Cal. Rptr. 2d 627, 634–35 (Cal. Ct. App. 1994) (Johnson, J., dissenting)).

¶ 28.   New Red Arrow's reliance on these cases is unpersuasive. First, as *Northern Insurance* was a product-line successor liability case, we note that Wisconsin has explicitly rejected this exception to the rule against successor liability. *See Fish v. Amsted Indus., Inc.*, 126 Wis. 2d 293, 305, 376 N.W.2d 820 (1985) (declining to adopt California's product-line successor liability rule as set forth in *Ray*, 560 P.2d at 3).

¶ 29.   Second, *Northern Insurance*'s holding that insurance benefits follow liability has been rejected by several cases. In *General Accident Insurance Co. v. Superior Court*, 64 Cal. Rptr. 2d 781, 782 (Cal. Ct. App. 1997), Western MacArthur Co. sought declaratory relief against three insurance companies to determine their duties to defend and indemnify it for personal injury actions arising from its predecessor's distribution of asbestos. Pursuant to the product-line successor liability rule, Western MacArthur was found liable for its predecessor's defective products. Because it was not a named insured, Western MacArthur claimed a right to its predecessor's insurance coverage by operation of law.

¶ 30.   The California Court of Appeals concluded that a finding of successor liability in tort did "not create from whole cloth an insurance relationship between strangers, and insurance coverage under these circumstances does not transfer by operation of law." *Id.* The court rejected *Northern Insurance*'s conclusion that insurance coverage transfers by operation of law by a finding of successor liability for product liability torts.

> An insured-insurer relationship is a matter of contract. Successor liability is a matter of tort duty and liability. It is one thing to deem the successor corporation liable for the predecessor's torts; it is quite another to deem the successor corporation a party to insurance contracts it never signed, and for which it never paid a premium, and to deem the insurer to be in a contractual relationship with a stranger.

*General Accident*, 64 Cal. Rptr. 2d at 785. The court concluded that the product-line successor liability rule is a narrow exception to the rule against successor liability, that the rule should not be extended to insurance coverage cases, that coverage is a question of contract interpretation, that the duty to defend is based on the subject insurance contract, and that the person injured in a successor liability case is not in a contractual relationship with the manufacturer and "generally cannot protect himself or herself from the eventuality of injury from a product manufactured by a predecessor company." *Id.* at 786.

¶ 31.   In *Quemetco*, 29 Cal. Rptr. 2d at 627, the facts closely resemble those in the instant case. In the 1950s and 1960s, Western Lead Products Co. shipped hazardous waste to a disposal site. Western Lead was insured during this time by various insurance companies (respondents). In 1970, Western Lead changed its name to Quemetco, Inc. (Old Quemetco). Old Quemetco then sold its assets to a corporation and its subsidiary; the subsidiary changed its name to Quemetco, Inc. (New Quemetco) and Old Quemetco was dissolved. *See id.* at 628. More than a decade later, lawsuits were filed against New Quemetco arising out of alleged environmental contamination. New Quemetco sought

insurance coverage under insurance policies that had been issued to Old Quemetco.

¶ 32. The California Court of Appeals concluded that Old Quemetco's policies did not transfer to New Quemetco as a matter of law. The court declined to extend the product-line successor liability rule to the case, noting that courts "look to the contract itself to resolve the issue of coverage." *Id.* at 630. The court also determined that Old Quemetco's policies did not transfer to New Quemetco at the time of the assets' sale because the respondents never consented to the policy transfer pursuant to their consent provisions. *See id.* at 632. "To hold that the policies were assignable without respondents' consent would leave Old Quemetco without any insurance to cover any potential liability assessed against it." *Id.* In addition, the court asserted that the rationale for the consent clause bolstered the respondents' case.

> The purpose of consent provisions is "to prevent an increase of risk and hazard of loss by a change of ownership without the knowledge of the insurer." In the instant case, both Old Quemetco and New Quemetco assert coverage under respondents' policies. Thus, unless the consent clauses are enforced, respondents would be faced with the increased risk of having to defend two corporations. Therefore, the consent clauses are valid and enforceable.

*Id.* (citation omitted).

¶ 33. We find the *General Accident* and *Quemetco* cases persuasive. We disagree with the *Northern Insurance* court's extension of the product-line successor liability rule, a rule carved out under tort law, to a contract case. The successor liability rule was intended to protect an individual who, not being in a contractual

relationship with a manufacturer, cannot otherwise protect himself or herself from an injury arising from a product manufactured by a company that no longer exists. *See General Accident*, 64 Cal. Rptr. 2d at 786. The *Ray* court explained that the justification for imposing strict tort liability is "the protection of otherwise defenseless victims of manufacturing defects and the spreading throughout society of the cost of compensating them." *Ray*, 560 P.2d at 8 (citation omitted). Similarly, the basis for placing strict liability upon a successor to a manufacturer rests upon:

> (1) the virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business, (2) the successor's ability to assume the original manufacturer's risk-spreading rule, and (3) the fairness of requiring the successor to assume a responsibility for defective products that was a burden necessarily attached to the original manufacturer's good will being enjoyed by the successor in the continued operation of the business.

*Id.* at 9.

¶ 34.  The policies driving the product-line successor liability rule, however, are clearly not at play here. First, the EPA sought recovery from New Red Arrow and Old Red Arrow for CERCLA response costs in connection with the Lemberger sites. Regardless of whether New Red Arrow obtains coverage from Wausau, the EPA was not prevented from pursuing its action against New Red Arrow despite the fact that Old Red Arrow was succeeded by New Red Arrow. Second, the need to spread the costs associated with environmental cleanup has not risen to the same level of public concern as the need to protect otherwise defenseless

victims from manufacturing defects. New Red Arrow does not contend that environmental hazards will go unaddressed without the transfer of insurance policies to succeeding business entities. Accordingly, the policy reasons that bolster rules of strict liability and product-line successor liability do not support their application in the present case.

¶ 35.   As our supreme court noted in *City of Edgerton v. General Casualty Co.*, 184 Wis. 2d 750, 764, 517 N.W.2d 463 (1994), the question is not, "Who will pay the costs of environmental cleanup?" Rather, the issue here is whether New Red Arrow is an insured under the Wausau policies as a matter of contract law. We conclude that New Red Arrow is not. Because New Red Arrow never paid premiums on the policies and never bargained for the policies, there was no privity of contract between Wausau and New Red Arrow. In addition, the policies were never assigned to New Red Arrow. New Red Arrow, therefore, does not have a valid claim for coverage and Wausau did not have a duty to defend.

*By the Court.*—Order affirmed.