JOURNAL ENTRY AND OPINION
{¶ 1} Appellant The Glidden Company ("Glidden III") appeals from the trial court's decision granting judgment in favor of appellees. "Appellees" are insurance companies that sold comprehensive general liability insurance policies under which Glidden III is seeking coverage.[1] For the reasons discussed below, we reverse the decision of the trial court and remand the matter for further proceedings.
I. Overview
 {¶ 2} Glidden III filed this action seeking a declaratory judgment that appellees are required to defend and indemnify Glidden III with respect to a series of underlying lead-based paint actions ("underlying actions").[2] The underlying actions assert liability against Glidden III for bodily injury and/or property damage arising from the manufacture and sale of lead paint products nationwide over many years prior to 1974. Glidden III had acquired the paints business in 1986, following an extensive history of corporate transactions.
 {¶ 3} The intricate corporate history is set forth in detail in the trial court's memorandum opinion entered May 8, 2002. In the interest of judicial economy, we adopt that portion of the trial court's statement of the facts which follows.
 {¶ 4} "A. Undisputed Corporate History[3] andRelevant Facts
 {¶ 5} "1. Pre — 1987 Background
 {¶ 6} "The original SCM Corporation (SCM (NY)) was a New York corporation from 1924 to 1986. SCM is the sobriquet for Smith/Corona/Marchant. SCM (NY) is a named insured on the CGL policies at issue covering the period from April 1, 1967 to January 1, 1987.
 {¶ 7} "The original `The Glidden Company' (`Glidden I') was an Ohio corporation with its principal place of business in Cleveland, Ohio from 1917 to 1967. Glidden I was a manufacturer and seller of lead based paints and lead pigments used in paints. Glidden I was insured by London for property damage (1959-1967). Glidden I merged into SCM (NY) on September 22, 1967, which succeeded to the London policies previously issued to Glidden I. The former business operations of Glidden I were carried on through SCM (NY)'s subsidiaries or divisions. Thus, in 1968 Glidden I's acquired paint business became part of SCM (NY)'s Glidden-Durkee Division until 1976 when it was transferred to the Coatings Resins Division, where it remained until 1986. In 1976, the former pigments part of the business was placed in the Chemical/Metallurgical Division of SCM (NY) where it remained until 1985. On September 6, 1985, SCM (NY) incorporated ABC Chemicals, Inc. as a wholly owned subsidiary and transferred to it the assets of the domestic pigments business.
 {¶ 8} "Glidden I was a named insured on certain London policies for the period from 1959 to September 22, 1967 when it merged into SCM (NY). Upon the merger the London policy was endorsed to change the named insured to the Glidden-Durkee Division of SCM (NY) and coverage continued until January 1, 1970.
 {¶ 9} "2. The Hanson Take-Over in 1986 and Sale to ICI
 {¶ 10} "In January, 1986 HSCM Industries, Inc., a Delaware corporation and an indirect subsidiary of a British company known as Hanson Trust Plc, acquired control of SCM (NY) by a stock tender offer and implemented a plan of reorganization in order to sell off certain SCM (NY) businesses piece-meal. Thus, in May, 1986 HSCM Industries, Inc. was liquidated and stock ownership of SCM (NY) was transferred to certain indirect subsidiaries of Hanson known as the `fan companies' (HSCM-1, Inc. through HSCM-20, Inc.).
 {¶ 11} "In May, 1986 SCM (NY) adopted a Plan of Liquidation and Dissolution pursuant to which SCM (NY) transferred specified assets and liabilities of its business units to the various fan companies which held its stock. On August 12, 1986, pursuant to the liquidation, SCM (NY) transferred its paints, resins, coatings, caulking and adhesives business (essentially the Coatings Resins Division) to HSCM-6, Inc. Then on August 14, 1986, Hanson agreed to sell HSCM-6, Inc. to ICI American Holdings, Inc. (`ICI'). On August 22, 1986 HSCM-6 Inc.'s name was changed to The Glidden Company (`Glidden II').
 {¶ 12} "The Purchase and Sale Agreement between Hanson and ICI called for a sharing of pre-closing (October 31, 1986) liabilities of the paint business. Hanson and ICI agreed that Hanson would retain ownership of all insurance policies, i.e. including the ones at issue herein. However, a side Letter Agreement of the same date provided that `Hanson shall give ICI and its subsidiaries the benefit of any policy of insurance to the extent the same would provide cover for liability in respect of occurrences relating to the Business prior to Closing giving rise to loss, injury, or damage thereafter subject to indemnity on costs.'
 {¶ 13} "Before the October 31, 1986 closing, ICI assigned its rights under the Purchase and Sale Agreement to two of its wholly owned subsidiaries, Atkemix Seven, Inc. and Atkemix Eight, Inc. On December 30, 1986, Glidden II, (formerly named HSCM-6, Inc.) was liquidated and its assets distributed to Atkemix Seven and Atkemix Eight, after which Atkemix Eight was renamed `The Glidden Company' (`Glidden III'). Glidden III acquired Atkemix Seven (then known as the Macco Company) in 1987.
 {¶ 14} "3. SCM (NY) Since the Hanson Take-Over
 {¶ 15} "On October 30, 1986 as part of the liquidation and dissolution of SCM (NY), the name of its subsidiary, ABC Chemicals, was changed to SCM Chemicals, Inc. ("SCM Chemicals"). On November 14, 1986, minus the assets and liabilities that had been transferred to the fan companies, SCM (NY) was merged into HSCM-20, Inc., a Delaware corporation, which was then renamed SCM Corporation ("SCM II"). On November 17, 1986 SCM II was merged into HSCM Holdings, Inc., another Hanson-controlled Delaware corporation, which then was renamed SCM Corporation ("SCM III").
 {¶ 16} "On October 14, 1988 SCM III was merged into HM Holdings, Inc., another Hanson-controlled Delaware corporation. Thus SCM Chemicals became a subsidiary of HM Holdings, Inc. Almost eight years later, on September 30, 1996, Hanson sold HM Holdings, Inc.'s indirect parent, Hanson Overseas Holdings Limited, to a newly formed corporation, Millennium Chemicals, Inc. HM Holdings, Inc., the survivor, after merger with Millennium Holdings, Inc. was renamed Millennium Holdings, Inc. SCM Chemicals, which had been a subsidiary of Millennium Holdings, Inc. then changed its name to Millennium Inorganic Chemicals, Inc. in 1997.
 {¶ 17} "On June 11, 2001 Millennium Chemicals incorporated a Delaware limited liability company named MHI 2, LLC. Two days later, on June 13, 2001, Millennium Holdings was merged into MHI 2, LLC which was renamed Millennium Holdings LLC, plaintiff herein."
 {¶ 18} Based on the foregoing corporate history outlined by the trial court, Glidden III and the Millennium plaintiffs brought actions, which were consolidated, claiming coverage under policies sold to Glidden I, SCM (NY), and the Glidden-Durkee Division of SCM (NY). Glidden III has brought this appeal challenging the trial court's rulings pertaining to its rights to coverage under the policies.
B. The Insurance Policies
 {¶ 19} The various insurance policies involved in this action were issued prior to the existence of Glidden III and before its acquisition of the paints business. The policies were issued during policy periods in which the risk of liability asserted in the underlying actions against Glidden III arose.
 {¶ 20} Prior to Glidden I's 1967 merger with SCM (NY), Glidden I purchased policies from London covering the period from April 27, 1959 to April 27, 1968. Upon the merger, SCM (NY) acquired the former business operations of Glidden I, including the paints business. When Glidden I merged into SCM (NY), the existing London policy was endorsed to change the named insured to the "Glidden-Durkee Division of SCM Corporation," the division in which Glidden I's paints business had been placed. The Glidden-Durkee Division continued as the named insured under the London policies at issue until January 1, 1970.
 {¶ 21} SCM (NY) is the named insured on the policies issued by Lumbermens, AMICO, Century (as successor to INA), and Hartford, covering the collective period of April 1, 1967 to January 1, 1987. None of these insured companies has engaged in the production or sale of lead-based paints since 1973. The risk of lead-paint liability that Glidden III faces is a result of the pre-1974 operations of the paints business.
C. The Trial Court's Decision
 {¶ 22} Glidden III and appellees filed cross-motions for partial summary judgment. The trial court denied Glidden III's motion for partial summary judgment, granted certain defendant insurers' cross-motion for summary judgment, granted final judgment in favor of the insurers, and dismissed Glidden III's second amended complaint as to all defendants with prejudice. The trial court issued a memorandum opinion, which was later amended, and a final order. In its final order, the trial court ruled that (1) collateral estoppel did not apply to an order of partial summary judgment entered in a prior Ohio action entitled TheGlidden Company and HM Holdings, Inc. v. Lumbermen's Mut. Cas.Co., Cuyahoga C.P. No. 215106; (2) Glidden III was not entitled to claim rights under insurance policies issued to SCM Corporation (or any division thereof) or issued to The Glidden Company (as the corporation existed prior to its 1967 merger with SCM Corporation); and (3) Glidden III was not an insured under any of the policies at issue.
 {¶ 23} Glidden III has brought this appeal, raising nine assignments of error for our review.[4]
 II. Standard of Review
 {¶ 24} The standard of review for an appeal from a summary judgment ruling is de novo. Grafton v. Ohio Edison Co.,77 Ohio St.3d 102, 105, 1996-Ohio-336. In applying the de novo standard, we review the trial court's decision independently and without deference to the trial court's determination. Brown v. SciotoCty. Bd. of Commrs. (1993), 87 Ohio App.3d 704, 711. In order to obtain summary judgment, the moving party must show that "(1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion when viewing evidence in favor of the nonmoving party, and that conclusion is adverse to the nonmoving party."Grafton, 77 Ohio St.3d at 105, citing State ex rel. Cassels v.Dayton City School Dist. Bd. of Edn. (1994), 69 Ohio St.3d 217,219; Civ.R. 56(C).
 {¶ 25} With this standard in mind, we consider Glidden III's nine assignments of error. For ease of discussion, they will be addressed out of order and together where appropriate.
III. Analysis of Assigned Errors
 {¶ 26} We will begin our analysis with Glidden III's seventh assignment of error which provides:
 {¶ 27} "VII. The trial court erred in refusing to find that the prior Ohio action should be given collateral estoppel effect."
 {¶ 28} The doctrine of collateral estoppel provides that "a fact or a point that was actually and directly at issue in a previous action, and was passed upon and determined by a court of competent jurisdiction, may not be drawn into question in a subsequent action between the same parties or their privies, whether the cause of action in the two actions be identical or different." State ex rel. Stacy v. Batavia Local Sch. Dist. Bd.of Edn., 97 Ohio St.3d 269, 272, 2002-Ohio-6322, quoting Ft.Frye Teachers Assn., OEA/NEA v. State Emp. Relations Bd.,81 Ohio St.3d 392, 395, 1998-Ohio-435. Collateral estoppel "prevents parties from relitigating in a subsequent case facts and issues that were fully litigated in a previous case." State ex rel.Stacy, 97 Ohio St.3d at 272.
 {¶ 29} Collateral estoppel applies only when there is a final judgment. Cokor v. Borden Chemical Div. of Borden (Dec. 15, 1988), Cuyahoga App. No. 54745. Glidden III argues that entry of partial summary judgment in the prior Ohio action on the issues pertaining to appellees' duty to defend was a final judgment to which collateral estoppel should be applied. The prior Ohio action ended with a settlement.
 {¶ 30} Where a court does not adjudicate all of the claims pending before it and does not declare its judgment to be a final appealable order under Civ.R. 54(B), the judgment is not final for purposes of collateral estoppel. See Id.; Hoover v.Prudential Securities, Inc. (S.D.Ohio 2003), 285 F.Supp.2d 1073. Here, the partial summary judgment that was entered in the prior Ohio action was an interlocutory decision and, consequently, that decision was subject to revision at any time before the entry of judgment adjudicating all the claims. We find the trial court did not err in finding collateral estoppel did not apply. Glidden III's seventh assignment of error is overruled.
 {¶ 31} Glidden's first, second, third and fourth assignments of error provide:
 {¶ 32} "I. The trial court erred in concluding that Glidden III did not retain the beneficial rights to insurance coverage pursuant to the 1986 corporate transactions."
 {¶ 33} "II. The trial court erred in concluding that Hanson could not transfer the paints business' rights to insurance coverage to ICI."
 {¶ 34} "III. The trial court erred in concluding that Hanson, as the ultimate parent of SCM (NY), did not have the authority to bind SCM (NY) with respect to insurance."
 {¶ 35} "IV. The trial court erred in concluding that the anti-assignment clause in the policies prohibited the assignment of the policies without the consent of appellees after a loss has occurred."
 {¶ 36} Under these assignments of error, Glidden III argues, among other issues, that (1) the paints business was independently insured under the policies, (2) the policies provide specific beneficial rights to coverage to the paints business and that these rights remained with the paints business when it was acquired by Glidden III, and (3) the rights to coverage were available to Glidden III after the 1986 corporate transactions.
 {¶ 37} Appellees state that the "paints business" was actually paint-related assets and operations that once belonged to Glidden I and after they were acquired by SCM (NY) were housed in the Glidden-Durkee Division and then the Coatings and Resins Division, which were unincorporated operating divisions. Appellees claim that the paint-related assets and operations, even as part of a division of SCM (NY), had no legal identity apart from SCM (NY) and therefore had no rights independent of SCM (NY).
 {¶ 38} We agree with appellees that an unincorporated division has no separate legal identity from the corporation of which it is a part. However, this does not mean an unincorporated division is not entitled to the benefits of coverage.
 {¶ 39} In the absence of a policy exclusion, a corporation's insurance policy extends rights to coverage, including the duty to defend, to unincorporated divisions. Container Supply Co. v.Fireman's Fund Ins. Co. (1989), 712 F.Supp. 871 (finding insurance company owed a duty to defend an unincorporated division that was merely a name used for marketing plastic containers produced by the insured corporation). Moreover, an insurance company is obligated to extend coverage for operations of such divisions. See Id. The reason for extending coverage to corporate divisions and subdivisions was explained in ContainerSupply:
{¶ 40} "First, a corporation is `a single entity incontemplation of law, and, although it may have many departments,or subdivisions, being a corporation, it is an indivisible unit.'Consequently, insurance applicable to the corporation as a wholenaturally extends to an indivisible part of the whole."
Id. at 872 (internal citations omitted).
 {¶ 41} In this case, the paints business was initially part of Glidden I and, following the merger, became part of SCM (NY)'s Glidden-Durkee Division and then the Coatings and Resins Division. These divisions were owned, controlled and managed by SCM (NY).
 {¶ 42} Because the policies do not contain any exclusions with respect to the paints business or the divisions in which it was housed, coverage was extended to the paints business.[5] The policies covered risks associated with the paints business. To the extent that the paints business was covered by the policies while operating as part of the insured corporation, benefits of insurance coverage extended to liabilities of the paints business.
 {¶ 43} The main issue before this court is whether the insurance benefits covering pre-acquisition risks of the paints business were assigned to or acquired by Glidden III. In considering this issue, we find it unnecessary to determine whether the paints business was an independent insured under the policies or whether it could possess rights independent of SCM as a non-legal entity. Instead, we can resolve this issue by considering whether the insurance rights and benefits passed through the 1986 corporate transactions or as a matter of law.
 {¶ 44} In 1986, Hanson acquired control of SCM (NY) by a stock tender offer. Glidden III claims that Hanson, as the ultimate parent of SCM (NY), owned the benefits of the policies and had the right to sell the benefits under the policies to ICI. Glidden III further asserts that the fact that SCM (NY) held legal title to the policies is inapposite to Hanson's conveyance of the benefits through the side letter agreement. Glidden III also argues that a parent company's actions can bind its subsidiaries.
 {¶ 45} We do not agree with Glidden III's logic. As a general rule, an insurance policy issued to a subsidiary does not automatically cover the parent company. Knoll Pharmaceutical Co.v. Automobile Ins. Co. of Hartford (N.D.Ill. 2001),167 F.Supp.2d 1004, 1008. Furthermore, a parent company that is not a named party cannot transfer the rights and duties under the policies.[6] As stated in Knoll, "[a]s a matter of contract law, because [the parent company] was not a party to the contract, it could not transfer the rights through an asset purchase agreement."[7] Accordingly, since Hanson was not a party to the insurance policies, it could not transfer benefits of the policy through the side letter agreement.
 {¶ 46} The record reflects that SCM (NY), which was a party to the insurance policies, did not transfer the policies or the rights to insurance when it distributed the paints business to HSCM-6. SCM (NY) explicitly excluded all insurance policies from the distribution of the paints business to HSCM-6 (Glidden II) in the memorandum of distribution. The language used by the parties manifests a clear intent to exclude the policies and any rights and benefits thereunder.
 {¶ 47} We find that the rights and benefits of the policies did not transfer through the distribution or purchase agreement. However, we must still examine whether these rights transferred by operation of law.
 {¶ 48} Assignments of error two and three are overruled. Assignments of error one and four are moot.[8]
 {¶ 49} Glidden III's fifth and ninth assignments of error provide:
 {¶ 50} "V. The trial court erred in finding that the independent rights to coverage held by the paints business did not pass to Glidden III by `operation of law.'"
 {¶ 51} "IX. The trial court erred in refusing to find that appellees have a duty to defend Glidden III in connection with the underlying actions."
 {¶ 52} Glidden III is seeking to obtain coverage for liabilities it faces in connection with the manufacture and sale of paints containing lead pigment by Glidden I or SCM (NY) prior to 1974. The underlying litigation in which Glidden III is involved relates to pre-acquisition operations of the paints business. Glidden III claims that the benefits of insurance followed the liability by operation of law.
 {¶ 53} Appellees argue that New York law should be applied to this determination. Before engaging in any choice of law analysis, a court must first determine whether any conflict exists. If the competing states would use the same rule of law or would otherwise reach the same result, it is unnecessary for a court to make a choice of law determination because there is no conflict. McDonald v. Williamson, Cuyahoga App. No. 81590, 2003-Ohio-6606.
 {¶ 54} This court has not found any cases from either Ohio or New York that have squarely addressed the issue of whether insurance follows the liability for pre-acquisition occurrences. Appellees rely on EM Indus., Inc. v. Birmingham Fire Ins. Co.
(1988), 529 N.Y.S.2d 121, but it is not conclusive authority. In that case, the court, in a single paragraph, found that the insurance company never insured the plaintiff and did not become the plaintiff's insurance carrier by virtue of the plaintiff's acquisition of the business whose activities gave rise to the liability. The court did not engage in any pre-acquisition risk or "operation of law" analysis. Further, there is authority in New York which has applied the Northern Insurance decision and has determined that a surviving corporation is entitled to insurance coverage for claims arising out of pre-acquisition activities in a merger situation. See Texaco, supra. Because of the lack of clear authority in Ohio and New York, we find no choice of law determination is necessary.
 {¶ 55} There is limited authority in other jurisdictions on the issue of whether insurance coverage follows liability by operation of law. This authority is split on the issue. Glidden III argues that this court should follow the Northern Insurance
line of cases, which support the operation of law theory. SeeNorthern Ins., 955 F.2d 1353. Appellees claim this court should follow the Henkel line of cases, which have rejected the operation of law theory. See Henkel Corp. v. Hartford Acc. andIndem. Co. (2003), 129 Cal.Reptr.2d 828.
 {¶ 56} Courts have found that insurance coverage transfers by operation of law in various contexts. Coverage of a predecessor corporation has been held to transfer by operation of law to a surviving corporation after a merger that does not result in an increase in risk to the insurer. Knoll, 167 F.Supp.2d 1004. Coverage, including rights to indemnity and a defense, has been held to transfer by operation of law to a successor corporation in product-line successor cases for pre-sale occurrences.Northern Ins., 955 F.2d 1353.
 {¶ 57} In Northern Insurance, the Ninth Circuit court explained: "This right to indemnity followed the liabilityrather than the policy itself. As a result, even though the parties did not assign the [insurance company]'s policy in the agreement, the right to indemnity under the policy transferred to the [buying company] by operation of law." Id. at 1357 (emphasis added).
 {¶ 58} In the case at bar, the trial court defined the issue as whether the right to a defense follows the assets. The issue, rather, is whether this right follows the liability.
 {¶ 59} The product-line theory has been extended to a successor responsible for environmental cleanup where the events creating the liability occurred prior to the transfer of liability. B.S.B. Diversified Co., 947 F.Supp. 1476. It has also been found that coverage may transfer by operation of law to a corporation that purchases certain assets of a business under a more general theory of corporate succession. Total WasteManagement Corp. v. Commercial Union Ins. Co. (D.N.H. 1994),857 F.Supp. 140 (lower court applied a "common sense" look at the corporate transfer and found that there was a material issue of fact as to whether the purchaser of assets was in substance, if not form, liable as the successor corporation).[9]
 {¶ 60} Appellees cite certain cases which have rejected the operation of law theory.[10] Appellees claim that policy language restricts the insurer's obligations to insureds, not to the insured's "risks." According to appellees' argument, under principles of contract law, insurance rights may not be transferred by operation of law. Appellees argue that this court should reject the "operation of law" approach of the NorthernInsurance line of cases, and follow the Henkel decision.
 {¶ 61} In Henkel, 129 Cal.Rptr.2d 828, the Henkel Corporation acquired the metallic chemical product line of another company and assumed all related liabilities. The court found that liability was not being imposed upon Henkel by law, but rather by its assumption of liability by contract. Id. at 833. As a result, the court found that Henkel's rights as a successor were defined and limited by the contract. Id. at 834. The court further held that because the policy benefits were assigned without the insurer's consent, the assignment violated the anti-assignment clause. Id. The court rejected the claim that under an occurrence-based policy, benefits can be assigned without consent once the event giving rise to the liability has occurred. Id. at 835. Instead, the court found that the claims could not be assigned because they had not been reduced to a sum of money due or become due under the policy. Id. at 836.
 {¶ 62} The dissenting judge in Henkel found the majority's decision was contrary to well-settled law and the general rule that after a loss has occurred, the policy benefits can be assigned without insurer consent or regard to the no-assignment clause. Id. at 837 (Moreno, J., dissenting); see, also, footnote 8, supra. This rule applies to events or activities preceding assignment. Id. We agree with the Henkel dissent and the cases which refuse to enforce anti-assignment provisions against claims that arise from pre-assignment occurrences. Further, becauseHenkel viewed the liabilities as arising after the acquisition, we do not adopt its rejection of the "operation of law" theory.
 {¶ 63} We also recognize the dissenting opinion in QuemetcoInc., 29 Cal.Rptr.2d 627, which agreed with NorthernInsurance's conclusion that insurance benefits follow liability in successor liability situations by operation of law. The dissent also found that the principle applies to all "successor liability" situations, not just product liability cases. "If the law holds the successor liable for its predecessor's tortious acts — no matter the nature of those acts — then the law likewise transfers the insurance benefits covering liability for those acts to the successor." Quemetco, 29 Cal.Rptr.2d at 634-35
(Johnson, J., dissenting).
 {¶ 64} We believe the better-reasoned authority applies the operation of law theory. Courts applying this theory have continued to extend its application to more general successor liability situations. We find that a corporation which succeeds to liability for pre-acquisition operations of another entity acquires rights of coverage by operation of law. This theory applies even where the acquisition was a purchase of assets or only part of a predecessor corporation.
 {¶ 65} Appellees argue that transferring insurance rights by operation of law will result in increased risks because multiple entities will be able to claim coverage under the policies, namely, Glidden III and Millennium Holdings (the ultimate successor to SCM (NY)). We do not believe that this presents an increased risk. Risks of mergers, acquisitions, sale of assets, and other corporate restructures were present when the policies were written.
 {¶ 66} Further, several courts have recognized that insurers' risks have not increased when their duty to indemnify and defend relates to events occurring prior to transfer. Total WasteManagement Corp., 857 F.Supp. at 152; Northern Ins. Co.,955 F.2d at 1358; B.S.B. Diversified Co., 947 F.Supp. at 14;Henkel, 129 Cal.Rptr.2d at 840 (Moreno, J., dissenting). When the activities giving rise to the damage or loss occur during the term of the policy and prior to any transfer of assets, the risk is no greater than when the policy was written. Total WasteManagement Corp., 857 F.Supp. at 153, citing Northern Ins.Co., 955 F.2d at 1358. As stated in Northern Ins. Co.,955 F.2d at 1358: "When the loss occurs before the transfer, however, the characteristics of the successor are of little importance: regardless of any transfer the insurer still covers only the risk it evaluated when it wrote the policy."
 {¶ 67} To find that an insurance company is not obligated to provide coverage to a party that is liable for a risk the insurance company promised to insure against and for which they were paid, an agreed premium would result in an unfair windfall to the insurance company. As stated in the Henkel dissent:
{¶ 68} "The majority's holding allows insurers to secure [an]unfair windfall. The Lockheed plaintiffs alleged that theirinjuries were caused by exposure to metallic chemicalsmanufactured by Anchem and occurred during the time in which thepolicies issued by defendant insurers were in effect. Theinsurers in this case had received premiums to insure againstthese types of injuries. Yet under the majority's holding, theinsurers will owe no coverage to any party for a risk theypromised to insure against and for which they were paid an agreedpremium.
 {¶ 69} "Moreover, the majority's conclusion could restrictcorporate restructuring, reorganization, merger, or sale. * * *.
 {¶ 70} "A successor company would not be inclined to assumethis risk of liability for the torts of a predecessor withoutalso receiving the benefits of the predecessor's insurancecoverage for presale occurrences. It is highly unlikely that asuccessor company would be able to obtain insurance coverage forinjuries that have already occurred before the successor'sacquisition of the business."
 Henkel, 129 Cal.Rptr.2d at 841 (Moreno, J., dissenting).
 {¶ 71} We agree with the Northern Insurance line of cases and the rule that insurance benefits follow the liability for losses arising from pre-acquisition activities by operation of law. We hold that Glidden III is entitled to insurance benefits under the insurance policies at issue for the pre-acquisition activities of the paints business, including the right to indemnification and the right to a defense.
 {¶ 72} Glidden III's fifth and ninth assignments of error are sustained.
 {¶ 73} Glidden III's eighth assignment of error provides:
 {¶ 74} "VIII. The trial court erred in finding that New York Law applies to the post-1967 London policies and the SCM (NY) policies."
 {¶ 75} Glidden III raises this assignment of error with respect to the allocation of insurance coverage among the multiple insurers. Allocation involves the apportionment of a covered loss across multiple triggered insurance policies.Goodyear Tire Rubber Co. v. Aetna Cas. Sur. Co.,95 Ohio St.3d 512, 514-515, 2002-Ohio-2842. The parties contest whether defense costs should be prorated among the various carriers or whether Glidden III is entitled to recover "all sums" against any specific carrier. The trial court applied New York law and found that allocation of defense costs among insurers was to be pro rata. Glidden III argues that Ohio law should govern and that an "all sums" approach should be applied.
 {¶ 76} When Ohio law conflicts with that of another state, a court must engage in a choice of law analysis. See, generally,Ohayon v. Safeco Ins. Co., 91 Ohio St.3d 474, 2001-Ohio-100. When the parties to an insurance contract do not specify which state's law applies to the contract's interpretation, a court should consider the factors set forth in Section 188 of the Restatement (2nd) of Conflict of Laws. See Id. at 477. Section 188 provides that when the parties do not specify the choice of law, the parties' "rights and duties under the contract are determined by the law of the state that, with respect to that issue, has `the most significant relationship to the transaction and the parties.'" Id., quoting Restatement at 575, Section 188(1).
 {¶ 77} A court that considers which state has the most significant relationship to the transaction and to the parties should examine the following factors: (1) the place of contracting; (2) the place of negotiation; (3) the place of performance; (4) the location of the subject matter; and (5) the domicile, residence, nationality, place of incorporation, and place of business of the parties. See Id., citing Section 188. The above factors "are keyed to the justifiable expectations of the parties to the contract, not to the ultimate benefit of one party over another." Id. at 479.
 {¶ 78} In insurance cases, the most significant contact is considered to be the location of the subject matter, i.e., the location of the insured risk. Sarka v. Love, Cuyahoga App. No. 83446, 2004-Ohio-1911. As noted by the Ohayon court, the rights created by an insurance contract should be determined "by the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy, unless with respect to the particular issue, some other state has a more significant relationship * * * to the transaction and the parties." Ohayon, 91 Ohio St.3d at 479, quoting Restatement at 610, Section 193.
 {¶ 79} The parties agree that the policies at issue do not provide which state's laws are to be applied. Since state laws are conflicting on the issue of allocation, we must engage in a choice of law analysis.
 {¶ 80} The London policies were issued to Glidden I. Glidden I was a stand-alone Ohio corporation before the merger; the policies were sent to Glidden I in Ohio where its executive offices and principal place of business were located; and the paints business operations were in Ohio. Although the Glidden-Durkee Division of SCM (NY) became the named insured under the London policy following the merger, the paints business remained in Ohio.
 {¶ 81} SCM (NY) was a New York corporation. The SCM (NY) insurance policies were negotiated, issued and delivered to SCM (NY) in New York. Premiums were also paid in New York. However, here again, the paints business remained in Ohio.
 {¶ 82} Appellees contend that because SCM (NY) had a wide range of operations in many states, its insured risks were spread across the country. Glidden III argues that the appellees which sold the policies to SCM (NY) were aware that they were insuring risks associated with the paints business operations located in Ohio.
 {¶ 83} We have previously recognized that "[w]here nationwide coverage is provided, the policy's legitimate expectation is that the site of the insured risk is more significant than the insurer's residence or the place of negotiation. When a large insurer issues a policy designed to apply nationwide, it has no legitimate expectation that the law of its residence will apply in other states." McDonald v. Williamson, Cuyahoga App. No. 81590, 2003-Ohio-6606.
 {¶ 84} We find that although SCM (NY) may have purchased nationwide coverage, the risks at issue relate to liability arising from the paints business, and therefore the principal location of the insured risk was Ohio. Appellees should have been aware at the time of contracting that they could be required to indemnify and defend liability arising from the Ohio operations of the paints business. The allocation of costs for a covered loss arising from those Ohio operations should be determined by Ohio law.
 {¶ 85} We believe that with respect to the particular issue, Ohio has the most significant relationship to the transaction and the parties. We conclude that Ohio law should be applied to determine allocation issues.
 {¶ 86} Under Ohio law, when a continuous occurrence triggers claims under multiple primary insurance policies, "the insured is entitled to secure coverage from a single policy of its choice that covers `all sums' incurred as damages `during the policy period,' subject to that policy's limit of coverage. In such an instance, the insurers bear the burden of obtaining contribution from other applicable primary insurance policies as they deem necessary." Goodyear Tire Rubber, 95 Ohio St.3d at 517.
 {¶ 87} Glidden III's eighth assignment of error is sustained.
 {¶ 88} Glidden III's sixth assignment of error provides:
 {¶ 89} "VI. The trial court erred in concluding that appellees did not waive their right to assert their supposed `named insured' defense against Glidden III."
 {¶ 90} This assignment of error is moot. Judgment reversed and remanded.
This cause is reversed and remanded to the lower court for further proceedings consistent with this opinion.
It is, therefore, considered that said appellant recover of said appellees costs herein.
It is ordered that a special mandate issue out of this court directing the Cuyahoga County Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Karpinski, P.J., Concurs; McMonagle, J., Concurs in part and dissents in part with separate concurring and dissenting opinion.
[1] Appellees include Lumbermens Mutual Casualty Company ("Lumbermens"), Hartford Accident and Indemnity Company ("Hartford"), American Motorists Insurance Company ("AMICO"), Century Indemnity Company ("Century") (successor to INA), and Certain Underwriters at Lloyd's London and London Market Insurance Cos. (collectively "London"). Continental Casualty Company ("Continental Casualty") is a former defendant who settled with Glidden III.
[2] The action was consolidated with a separate action filed by Millennium Chemicals, Inc., Millennium Holdings, LLC, and Millennium Inorganic Chemicals, Inc. ("Millennium"). The Millennium plaintiffs are not parties to this appeal.
[3] "The [trial court relied] on Stipulations of Corporate History and Undisputed Facts as well as various affidavits of the parties, their counsel and voluminous briefs, exhibits and appendices thereto. Oral argument was held on these issues on April 9, 2002 (Oral Arg ___)."
[4] The Complex Insurance Claims Litigation Association has filed an amicus curiae brief.
[5] We note that some of the policies expressly identified the Glidden-Durkee Division. London sold policies directly to the Glidden-Durkee Division; Lumbermens charged the Glidden-Durkee Division separate premiums for "general liability" and referred to it as a subsidiary; and AMICO provided separate coverage limits to the Glidden-Durkee Division for certain coverage.
[6] The court in Knoll also stated that even if the parent company were a covered insured, pursuant to the terms of the policy itself which limited authority to the named insured, the parent company could not have transferred the rights and duties under the policy.
[7] Premier Roofing Inc. v. Home Ins. Co. (Conn.Super. Aug. 13, 1999), No. CV 990422096, a case relied upon by Glidden III, is not applicable. In that case, the parent company was a named insured to the premium agreements.
[8] Although the assignment issue is moot, we note that a majority of courts refuse to enforce anti-assignment provisions against claims for pre-assignment losses. See, e.g., NorthernIns. Co. of N.Y. v. Allied Mutual Ins. Co. (C.A.9, 1992),955 F.2d 1353, 1357-58, certiorari denied, 112 S.Ct. 3033; B.S.B.Diversified Co. v. American Hardware Mutual Ins. Co. (W.D.Wash. 1996), 947 F.Supp. 1476; Texaco A/S, S.A. v. Commercial Ins.Co. (S.D.NY Oct. 26, 1995), No. 90 Civ. 2722 (JFK); Total WasteManagement Co. v. Commercial Union Ins. Co. (Dist.NH 1994),857 F.Supp. 140, 148. The majority rule recognizes that an insurer's risk does not increase where the loss or liability arose prior to the transfer.
[9] "A successor corporation is defined as `another corporation, which through amalgamation, consolidation, or other legal succession, becomes invested with rights and assumes burdens of [the] first corporation.'" Id., citing Unifirst Corp.v. Jeff Wyler Ford, Inc. (Jan. 19, 1993), Clermont App. No. CA92-08-079.
[10] See Henkel, 129 Cal.Rptr.2d at 835-38; Red Arrow Prods.Co., Inc. v. Employers Ins. of Wausau (Wis.App. 2000),607 N.W.2d 294, 302; General Accident Ins. Co. v. Western MacArthurCo. (1997), 64 Cal.Rptr.2d 781, 788; Quemetco, Inc. v. PacificAuto Ins. Co. (1994), 29 Cal.Rptr.2d 627, 630-31; KoppersIndustries, Inc. v. North River Ins. Co. (W.D.Pa. Mar. 5, 1996), Civ. Action No. 94-1706.