PILKINGTON NORTH AMERICA, INC. *v.* TRAVELERS
CASUALTY & SURETY COMPANY ET AL.

[Cite as *Pilkington N. Am., Inc. v. Travelers Cas. &
Sur. Co.,* 112 Ohio St.3d 482, 2006-Ohio-6551.]

(No. 2005–0378—Submitted December 14, 2005—Decided December 20, 2006.)

O'CONNOR, J.

{¶ 1} Pursuant to S.Ct.Prac.R. XVIII(6), we accepted three questions of state law certified by the United States District Court for the Northern District of Ohio, Western Division:

{¶ 2} 1. "Whether the demand by Pilkington North America for defense and indemnification, as asserted in this case, constitutes a chose in action, as that term is defined under Ohio law?"

{¶ 3} 2. "Whether the policies' 'anti-assignment' clauses bar acquisition by Pilkington North America of such chose in action?"

{¶ 4} 3. "Whether by operation of law insurance benefits for transferred liabilities were conveyed, along with those liabilities, so that Pilkington North America may, notwithstanding the anti-assignment clauses, pursue insurance under the original LOF Glass's policies for the environmental liabilities at issue here, which arise out of the original LOF Glass's operations." 105 Ohio St.3d 1514, 2005-Ohio-1880, 826 N.E.2d 313.

{¶ 5} We answer the first question as follows: A chose in action arises under an occurrence-based insurance policy at the time the loss occurred.

{¶ 6} As to the second question, we answer that such a chose in action is transferable despite the existence of an anti-assignment provision contained in the policy as to the duty to indemnify. We are unable to answer definitively whether such a chose in action is transferable as to the duty to defend.

{¶ 7} As to the third question, we answer that when a covered occurrence under an insurance policy occurs before liability is transferred to a successor corporation, coverage does not arise by operation of law when the liability was assumed by contract.

### Facts and Procedural History

{¶ 8} The district court provides the following statement of facts, upon which we rely. The underlying suit is by a glass manufacturer (petitioner, Pilkington North America, Inc.), against various insurance companies that issued liability policies to Libbey–Owens–Ford Glass Company ("LOF Glass") of Toledo. Pilkington purchased LOF Glass's glass-manufacturing business in 1986. Pilkington has subsequently become the target of environmental claims arising from LOF Glass's manufacturing operations.

{¶ 9} Pilkington filed suit against the insurers, claiming that under the policies issued to LOF Glass, the defendants owe Pilkington duties of defense and indemnity for the underlying environmental losses and actions. It is undisputed that the defendant insurance companies issued liability policies to LOF Glass.

## A. Corporate History

{¶ 10} The underlying controversy involves the effect of the corporate history of LOF Glass on the insurers' responsibilities in this case.

{¶ 11} In 1968, LOF Glass changed its name to Libbey–Owens–Ford Company to reflect its expansion into other activities not related to glass. In February 1986, Libbey–Owens–Ford Company, through a transfer and assumption agreement, placed the assets and liabilities of its glass-manufacturing division into a new, wholly owned corporate subsidiary, LOF Glass, Inc. Then in March 1986, Libbey–Owens–Ford Company entered into a share-exchange agreement with Pilkington Brothers P.L.C, a British glass manufacturer, and one of its subsidiaries, Pilkington Holdings, Inc. As a result, shares of the newly formed LOF Glass, Inc. became owned by these Pilkington entities.

{¶ 12} LOF Glass, Inc. manufactured glass under the name of Libbey–Owens–Ford Company from 1986 until July 2000, when it was renamed Pilkington North America. The glass operations are ongoing.

{¶ 13} Libbey–Owens–Ford Company, after selling the glass-manufacturing operations in 1986, remained in other lines of business and has since undergone several name changes. It has been known as Trinova Corporation and most recently as Aeroquip–Vickers, Inc. It is now a wholly owned subsidiary of the Eaton Corporation. There has been no connection to the glass business since 1986.

{¶ 14} Through the 1986 transfer and assumption agreement, Pilkington has obtained both the glass business and the environmental liabilities arising from the business, including those liabilities arising from conduct by the original LOF Glass.

## B. Insurance Policy Issues

{¶ 15} All parties agree that the insurance policies under which Pilkington is seeking coverage were not transferred to Pilkington and that Aeroquip–Vickers, Inc. is the current owner of these policies. As previously stated, the only present issue is Pilkington's claims to defense and indemnification for environmental liabilities arising from the glass operations of the original LOF Glass.

{¶ 16} Pilkington argues that such coverage arises under two theories of law. It first argues that it acquired a chose in action with regard to the losses as a result of the 1986 transfer and assumption agreement. Second, it contends that

when it purchased the glass business of the original LOF Glass, the rights to defense and indemnity under the policies followed by operation of law for environmental liabilities arising from the prior operation of that business.

{¶ 17} The respondent insurers contend that the 1986 transfer and assumption agreement transferred no interest under the policy to Pilkington because of anti-assignment clauses in the policies in question. They also generally dispute the legal contention that coverage follows a successor legal entity as a matter of law.

## Analysis as to Question One

{¶ 18} The first question certified to us is whether Pilkington's demand for defense and indemnification constitutes a "chose in action" under Ohio law.[1]

{¶ 19} Generally speaking, a "chose in action" is a "proprietary right in personam, such as a debt owed by another person, a share in a joint-stock company, or a claim for damages in tort." Black's Law Dictionary (8th Ed.2004) 258. The term can also be defined as "[t]he right to bring an action to recover a debt, money, or thing." Id.

{¶ 20} This court has recognized that the phrase applies to the right to bring an action in tort and in contract. In *Cincinnati v. Hafer* (1892), 49 Ohio St. 60, 65, 30 N.E. 197, we stated: "[W]hile * * * a 'chose in action' is ordinarily understood [to be] a right of action for money arising under contract, the term is undoubtedly of much broader significance, and includes the right to recover pecuniary damages for a wrong inflicted either upon the person or property. It embraces demands arising out of a tort, as well as causes of action originating in the breach of a contract."

{¶ 21} This court has never addressed the question of when a chose in action becomes an enforceable right. In the insurance context, the Sixth District Court of Appeals most recently addressed the issue in *In re Estate of Ray*, 6th Dist. No. WD–02–049, 2003-Ohio-2001, 2003 WL 1904412. In *Ray*, the court characterized a decedent's claim against his insurer for insurance proceeds as a "chose in action" that arose when the damage occurred and that was still enforceable after the decedent's death. The Sixth District further noted that "[a] chose in action is personalty which, unlike real property, passes on death to the holder's executor." Id. at ¶ 13 (citing *In re Wreede* (1958), 106 Ohio App. 324, 331–332, 7 O.O.2d 75, 154 N.E.2d 756). Accordingly, the Sixth District held that a casualty insurance claim arising from damage to the decedent's real estate was a chose in action that arises when the covered loss occurs.

---

1. The court acknowledges with appreciation the briefs provided by amici curiae, United Policyholders and the Complex Insurance Claims Litigation Association.

{¶ 22} The insurers in this case contend that the analysis of the California Supreme Court in *Henkel Corp. v. Hartford Acc. & Indemn. Co.* (2003), 29 Cal.4th 934, 129 Cal.Rptr.2d 828, 62 P.3d 69, should apply. In *Henkel*, the court, applying California precedent under circumstances nearly identical to those present in the instant matter, determined that no chose in action existed at the time of transfer because the claims for defense and indemnity "had not been reduced to a sum of money due or to become due under the policy" and because the insurers "had not breached any duty to defend or indemnify" the named insured, which in this case is the original LOF Glass. Id.

{¶ 23} We have "long held that an insurance policy is a *contract* between the insurer and the insured." (Emphasis sic.) *Ohayon v. Safeco Ins. Co. of Illinois* (2001), 91 Ohio St.3d 474, 478, 747 N.E.2d 206. In fact, the "long-standing principle" has been that "the relationship between the insurer and the insured is purely contractual in nature." *Nationwide Mut. Ins. Co. v. Marsh* (1984), 15 Ohio St.3d 107, 109, 15 OBR 261, 472 N.E.2d 1061.

{¶ 24} The insurance policies in the instant case are "occurrence" policies, i.e., they provide coverage for claims resulting from injury or damage that is based upon an occurrence during the policy period, regardless of when the claim is made. *Mominee v. Scherbarth* (1986), 28 Ohio St.3d 270, 299, 28 OBR 346, 503 N.E.2d 717, fn. 24; *Goodyear Tire & Rubber Co. v. Aetna Cas. & Sur. Co.*, 95 Ohio St.3d 512, 2002-Ohio-2842, 769 N.E.2d 835.

{¶ 25} The distinction between *Ray* and *Henkel* is that under *Ray*, the chose arises at the time of the loss, whereas in *Henkel*, the chose arises when the claim has been reduced to a sum of money owed. Our precedent has consistently recognized that the insurer's coverage obligation in an occurrence policy arises at the time of the occurrence. *Goodyear Tire*, supra.

{¶ 26} Indeed, the United States Supreme Court applied the same principles to a chose in action in *Cent. Tablet Mfg. Co. v. United States* (1974), 417 U.S. 673, 685, 94 S.Ct. 2516, 41 L.Ed.2d 398:

{¶ 27} "With a fire loss, the obligation to pay arises upon the fire. Unlike an executory contract to sell, the casualty cannot be rescinded. Details, including even the basic question of liability, may be contested, but the fundamental contractual obligation that precipitates the transformation from tangible property into a chose in action consisting of a claim for insurance proceeds is fixed by the fire." (Footnote omitted.)

{¶ 28} We adopt the same principle and hold that a chose in action arises under an occurrence-based insurance policy at the time of the covered loss. The distinction created in *Henkel* does not align with the obligations recognized in Ohio that the insured's right to recover arises automatically at the time of loss.

The lack of a specifically defined amount of recovery is not fatal to the determination that a chose exists.

## Analysis as to Question Two

{¶ 29} The recognition of a chose in action in the present case does not by itself mean that Pilkington is entitled to coverage under these insurance policies. A chose in action is merely a term (albeit a somewhat vague one) for the right established at the time of the loss. See 9 Corbin on Contracts (1979) 369, Section 859 (discussing why the author refuses to use the phrase "chose in action" "wherever clear analysis is necessary," as the phrase simply means a right against another person). The right still must have been properly transferred, and the claim must not be barred under any of the terms of the insurance policies issued to the original LOF Glass.

{¶ 30} We now address the second certified question: Whether the anti-assignment provisions in the insurance policies apply. All of the policies contain language prohibiting the assignment of any interest under the policy without the insurers' consent.

{¶ 31} The insurers contend that this prohibition contractually eliminates any possibility of a chose in action being passed to Pilkington. On its face, this would appear to be a correct statement of the law in Ohio. As discussed above, an insurance policy is a contract between an insured and the insurer. *Ohayon*, 91 Ohio St.3d at 478, 747 N.E.2d 206. We should not disturb the plain language of such a contract when the intent of the parties is evident. *Hybud Equip. Corp. v. Sphere Drake Ins. Co., Ltd.* (1992), 64 Ohio St.3d 657, 665, 597 N.E.2d 1096.

{¶ 32} The policies proscribe an assignment of an "interest" in the policy without the insurers' consent.[2] Pilkington contends that the anti-assignment provisions do not apply to assignments after the loss has already occurred. The insurers contend that as an express contractual prohibition, the anti-assignment provisions should preclude any obligation under the policy.

{¶ 33} Pilkington is seeking to invoke two duties contained in each of the policies: the duty of indemnification and the duty to defend. Each duty is separate and distinct under a liability policy. 14 Russ & Segalla, Couch on Insurance (3d Ed.2005), Section 200:3. The duty to defend is based on the allegations presented. *Sharonville v. Am. Emps. Ins. Co.*, 109 Ohio St.3d 186, 2006-Ohio-2180, 846 N.E.2d 833, paragraph one of the syllabus. The duty to indemnify arises from the conclusive facts and resulting judgment. 16 Couch on Insurance, Section 227:27.

---

2. Although the language used may vary among the policies, any variance is insufficient to alter the analysis here.

{¶ 34} Under an occurrence policy, an insurer is obligated to defend any claim arising out of wrongful conduct occurring during the coverage period. *Mominee,* 28 Ohio St.3d at 299, 28 OBR 346, 503 N.E.2d 717, fn. 24; 1 Leitner, Simpson and Bjorkman, Law and Practice of Insurance Coverage Litigation (2000) 4–13, Section 4.5. The duty to defend can be the most important coverage of a commercial general liability policy and comprises an increasingly significant part of the insurer's exposure. Hagglund, Weimer, Whitman & Hillestad, CGL Policy Handbook (2001), Sections 13.04 and 13.05; see, also, *Gen. Acc. Ins. Co. v. Ins. Co. of N. Am.* (1989), 44 Ohio St.3d 17, 21–22, 540 N.E.2d 266 (holding that the duty to defend represents a "substantial right" to both the insurer and the insured). In situations involving complex litigation, the cost of defense can often exceed the cost of indemnity. Rhodes, The Law of Commercial Insurance (1996), Section I.3.2; *Sherwood v. Hartford Acc. & Indemn. Co.* (1997), 347 Md. 32, 43, 698 A.2d 1078 ("Not infrequently, that expense [for defense] may approximate or even exceed the amount of any judgment rendered in the action"). The duty to defend gives the insurer the right to control the conduct of the litigation in order to safeguard its interests. 1 Leitner et al., Law and Practice of Insurance Coverage Litigation, Section 4.6.

{¶ 35} The duty of defense is much broader than the duty of indemnification and can be invoked even though no liability is ultimately established. 14 Couch, Section 200:3. In *Motorists Mut. Ins. Co. v. Trainor* (1973), 33 Ohio St.2d 41, 62 O.O.2d 402, 294 N.E.2d 874, this court held that under a liability insurance policy, it is the scope of the allegations against the insured that determines whether an insurance company has a duty to defend the insured. Id. at paragraph two of the syllabus. We held that "where the complaint brings the action within the coverage of the policy the insurer is required to make defense, regardless of the ultimate outcome of the action or its liability to the insured." Id. The *Motorists* holding was expanded in *Willoughby Hills v. Cincinnati Ins. Co.* (1984), 9 Ohio St.3d 177, 179, 9 OBR 463, 459 N.E.2d 555, in which we stated that "the duty to defend need not arise solely from the allegations in the complaint but may arise at a point subsequent to the filing of the complaint."

{¶ 36} It is long-standing tradition in the common law that all contract rights may be assigned except under three conditions. 3 Restatement of the Law 2d, Contracts (1981), Section 317(2). First, if there is clear contractual language prohibiting assignment, an assignment will not be enforced. Id., Section 317(2)(c); 29 Lord, Williston on Contracts (4th Ed.2003), Section 74:10; *Hybud Equip. Corp.*, 64 Ohio St.3d at 665, 597 N.E.2d 1096 (holding that contracts will be enforced according to their terms); *Mettler–Toledo, Inc. v. Republic Powdered Metals, Inc.* (May 29, 1996), 9th Dist. No. 2500–M, 1996 WL 285368 (holding that assignment of a warranty contrary to contractual prohibitions was void). Second, an assignment must not materially change the duty of the obligor, materially

increase the insurer's burden or risk under the contract, materially impair the insurer's chance of securing a return on performance, or materially reduce the contract's value. 3 Restatement 2d, Contracts, Section 317(2)(a); 29 Williston on Contracts, Section 74:10. See, also, *Kitt v. Home Indemn. Co.* (1950), 153 Ohio St. 505, 509, 41 O.O. 511, 92 N.E.2d 685 (holding that an insurer may not avoid liability when a change in partners of an insured partnership did not increase the underlying risk); *Schofield v. Benton* (Aug. 20, 1992), 10th Dist. No. 92AP–161, 1992 WL 208924 (adopting the Restatement language). Third, the assignment will not be valid if it is forbidden by statute or by public policy. 3 Restatement of Contracts, Section 317(2)(b); *Robbins v. Hennessey* (1912), 86 Ohio St. 181, 99 N.E. 319 (discussing statutory prohibition of assignment of a contract for payment of funeral expenses).

{¶ 37} In the insurance policies at issue, there is a contractual provision prohibiting the assignment of any interest under the policy. The anti-assignment provision has an important role in an insurance policy, as noted by the Ninth Circuit in *N. Ins. Co. of New York v. Allied Mut. Ins. Co.* (C.A.9, 1992), 955 F.2d 1353:

{¶ 38} "Risk characteristics of the insured determine whether the insurer will provide coverage, and at what rate. An assignment could alter drastically the insurer's exposure depending on the nature of the new insured. 'No assignment' clauses protect against any such unforeseen increase in risk." Id. at 1358.

{¶ 39} Any assignment of the rights after the losses would be, on its face, in direct contravention of this provision. It would seem that the analysis should end at this point under the plain-language approach of *Hybud Equip. Corp.*, 64 Ohio St.3d at 665, 597 N.E.2d 1096.

{¶ 40} Insurance contracts receive unique treatment post-loss, however. Insurance policies are generally construed such that assignment of an interest is valid *after* the occurrence of the loss insured against, and the assignment is then regarded as a transfer of the chose in action, even in the face of an anti-assignment provision. 2 Couch, Sections 34:2 and 34:25; 17 Williston on Contracts, Section 49:126; *St. Paul Fire & Marine Ins. Co. v. Allstate Ins. Co.* (1975), 25 Ariz.App. 309, 311, 543 P.2d 147; *Fiorentino v. Lightning Rod Mut. Ins. Co.* (1996), 114 Ohio App.3d 188, 192, 682 N.E.2d 1099 (holding that an insured under a commercial general liability policy may assign its claim under the policy to the injured party without contravening the anti-assignment provision).

{¶ 41} Only a few cases addressing the issue have involved an assignment of rights under a commercial general liability policy. See *Fiorentino*, supra. The issue of permitting assignment after loss in avoidance of the anti-assignment clause is an easier concept when dealing with life insurance or casualty insurance. The insured loss has already occurred, is clearly defined, and the insurer's

liability is fixed and established. Contrast this with a loss under a commercial general liability policy, especially under the facts of the instant case, where the loss may be over a period of indeterminate length and of an indeterminate magnitude.

{¶ 42} Much of the case law involving an anti-assignment clause in a commercial general liability policy is not on point. Almost all of these cases involve the active assignment of rights from the insured to a third party, usually the injured party. *Pub. Util. Dist. No. 1 of Klickitat Cty. v. Internatl. Ins. Co.* (1994), 124 Wash.2d 789, 881 P.2d 1020; *Elat, Inc. v. Aetna Cas. & Sur. Co.* (1995), 280 N.J.Super. 62, 66, 654 A.2d 503. Few cases involve the transfer of a chose in action to a successor corporate entity solely by virtue of the succession. Most involve some form of de facto merger or other circumstance in which the original corporation is no longer in existence. *Gopher Oil Co. v. Am. Hardware Mut. Ins. Co.* (Minn.App.1999), 588 N.W.2d 756 (purchase by successor that subsumed predecessor); *Westoil Terminals Co. v. Harbor Ins. Co.* (1999), 73 Cal.App.4th 634, 86 Cal.Rptr.2d 636 (de facto merger).

{¶ 43} As mentioned above, the commercial general liability policies Pilkington is seeking coverage under contain two contractual obligations: the duty to indemnify and the duty to defend. The duty to indemnify implicates both property damage and bodily injury. The losses are fixed at the time of the occurrence. We see no reason to deviate from the standard rule on this issue, and thus we hold that the chose in action as to the duty to indemnify is unaffected by the anti-assignment provision when the covered loss has already occurred.

### Analysis as to Question Three

{¶ 44} Pilkington also argues that because the policies were transferred by operation of law, the anti-assignment provisions should not be enforced. There is again limited authority as to whether insurance coverage follows liability in cases involving anti-assignment clauses.

{¶ 45} The primary case cited for the proposition that insurance coverage for presale activities follows an asset purchaser by operation of law is *N. Ins.*, 955 F.2d 1353. In *N. Ins.*, the Ninth Circuit held that an asset purchase transferred the duty to defend from the named insured to the purchaser as a matter of law when the liability giving rise to the policy claim arose before the purchase, even when the policy contained an anti-assignment clause. Id. at 1357–1358. In *N. Ins.*, much of the decision was driven by the fact that liability for presale activities was itself imposed by law on the purchaser. Further, although this point was not explicitly discussed, the successor entity, as the sole party liable, is the only party capable of demanding a defense under the policies in question.

{¶ 46} *Henkel* declined to extend *N. Ins.* to circumstances in which the liabilities are voluntarily assumed by the asset purchaser by contract instead of imposed by operation of law. 29 Cal.4th at 941, 129 Cal.Rptr.2d 828, 62 P.3d 69. It highlighted the three circumstances under which a buyer of corporate assets may be liable by operation of law for the torts of its predecessor under California law and under which insurance coverage would follow by operation of law. Id. at 941–942, 129 Cal.Rptr.2d 828, 62 P.3d 69. Because the liability for which coverage was sought was contractually conveyed to the successor, and the insurance policy had an anti-assignment provision, the *Henkel* court held that coverage did not follow by operation of law. Further, the court noted that any attempt to transfer coverage to a successor must fail when the original insured still exists or can be revived to demand a defense—a distinction not addressed in *N. Ins.* *Henkel*, 29 Cal.4th at 945, 129 Cal.Rptr.2d 828, 62 P.3d 69.

{¶ 47} *N. Ins.* relied on the fact that California and Washington apply the rule of product-line successor liability. Under this theory, "a purchaser of substantially all assets of a firm assumes, with some limitations, the obligation for product liability claims arising from the selling firm's presale activities. Liability is transferred irrespective of any clauses to the contrary in the asset purchase agreement." *N. Ins.*, 955 F.2d at 1357. The rationale for transferring insurance coverage for indemnification and defense by operation of law in such an instance is sound, since an unwary purchaser may be liable for significant bodily injury or property damage occurring before the sale, solely as a result of the purchase. The result also serves to ensure that the injured party receives recompense.

{¶ 48} Ohio does not follow the California product-line successor liability theory. Ohio has adopted the general rule of successor liability, which provides that the purchaser of a corporation's assets is not liable for the debts and obligations, including liability for tortious conduct, of the seller corporation. *Flaugher v. Cone Automatic Mach. Co.* (1987), 30 Ohio St.3d 60, 30 OBR 165, 507 N.E.2d 331; *Cyr v. B. Offen & Co., Inc.* (C.A.1, 1974), 501 F.2d 1145, 1152; 15 Fletcher, Cyclopedia of the Law of Private Corporations (1999), Section 7122. There are four exceptions to this general rule, three of which impose liability without regard to contract. A successor corporation may be held liable when:

{¶ 49} "(1) the buyer expressly or impliedly agrees to assume such liability;

{¶ 50} "(2) the transaction amounts to a *de facto* consolidation or merger;

{¶ 51} "(3) the buyer corporation is merely a continuation of the seller corporation; or

{¶ 52} "(4) the transaction is entered into fraudulently for the purpose of escaping liability." *Flaugher*, 30 Ohio St.3d at 62, 30 OBR 165, 507 N.E.2d 331.

{¶ 53} Additionally, some statutes, including the Comprehensive Environmental Response, Compensation, and Liability Act (Section 9601 et seq., Title 42, U.S.Code) have been construed as imposing liability on successor corporations without regard to contract. *SmithKline Beecham Corp. v. Rohm & Haas Co.* (C.A.3, 1996), 89 F.3d 154, 157; *Anspec Co., Inc. v. Johnson Controls, Inc.* (C.A.6, 1991), 922 F.2d 1240.

{¶ 54} None of those instances in which liability is imposed without regard to contract are alleged to be present. Thus, liability is not being imposed on Pilkington by operation of law, and we do not reach the question as to whether coverage follows by operation of law in such a circumstance.

{¶ 55} Some courts have expanded *N. Ins.* to include successor-liability cases not based on the product-line theory. See, e.g., *Glidden Co. v. Lumbermens Mut. Cas. Co.*, 8th Dist. No. 81782, 2004-Ohio-6922, 2004 WL 2931019, ¶ 64. See, also, *B.S.B. Diversified Co., Inc. v. Am. Motorists Ins. Co.* (W.D.Wash.1996), 947 F.Supp. 1476, 1481–1482; *Total Waste Mgt. Corp. v. Commercial Union Ins. Co.* (D.N.H.1994), 857 F.Supp. 140.

{¶ 56} There are a number of courts, in addition to *Henkel,* that have taken a different approach, holding that the contractual obligation defines the relationship between the parties when the liability arises as a matter of contract. *Red Arrow Prods. Co., Inc. v. Employers Ins. of Wausau* (App.2000), 233 Wis.2d 114, 132–134, 607 N.W.2d 294; *Gen. Acc. Ins. Co. v. Alameda Cty. Super. Court* (1997), 55 Cal.App. 4th 1444, 1454–1455, 64 Cal.Rptr.2d 781; *Quemetco, Inc. v. Pacific Auto. Ins. Co.* (1994), 24 Cal.App.4th 494, 500–503, 29 Cal.Rptr.2d 627.

{¶ 57} The courts expanding the *N. Ins.* holding to cases in which the underlying liability is contractually assumed and does not arise as a matter of law do so under the simple rationale that coverage should follow liability.

{¶ 58} This rationale is generally incorrect for cases in which liability is contractually assumed for the following reasons. First, as discussed, insurance is a contract between the insurer and the insured. *Ohayon,* 91 Ohio St.3d at 478, 747 N.E.2d 206. The parties specifically contract to control liability. Allowing indemnity to follow liability as a matter of law interferes with that control. If the parties fail to explicitly describe their rights under an insurance contract, they may have had their reasons, and requiring that coverage follow as a matter of law interferes in the contractual process.

{¶ 59} A commercial general liability policy can cover a business that maintains several plants or several different lines of business. When selling one of those plants, or one of those lines of business, a contractual agreement to assign liability but not the underlying chose in action may be designed to preserve rights under the policy for the original insured.

{¶ 60} Further, if coverage were to arise by operation of law and the original insured remains in operation, the limits of its coverage available under the policy may be reduced by any indemnity payments made on behalf of the additional insured. Additionally, and as discussed above, in certain cases, the insurer may be placed in the position of defending an additional insured where there was only one under the policy. The results of such complications are numerous under an "operation of law" theory that gives no consideration to whether the liabilities were assumed by contract or forced upon the successor by operation of law.

{¶ 61} We therefore hold that when a covered occurrence under an insurance policy occurs before liability is transferred to a successor corporation, coverage does not arise by operation of law when the liability was assumed by contract.

So answered.

As to Question One as answered:

MOYER, C.J., RESNICK and PFEIFER, JJ., concur.

LUNDBERG STRATTON, O'DONNELL and LANZINGER, JJ., dissent.

---

As to Question Two, to the extent answered:

MOYER, C.J., RESNICK and PFEIFER, JJ., concur.

LUNDBERG STRATTON, O'DONNELL and LANZINGER, JJ., decline to answer Question Two.

---

As to Question Three as answered:

MOYER, C.J., concurs.

LUNDBERG STRATTON, O'DONNELL and LANZINGER, JJ., concur in the answer.

RESNICK and PFEIFER, JJ., dissent.

---

**Separate views of MOYER, C.J., and O'CONNOR, J., as to Question Two:**

{¶ 62} The duty to defend requires a different analysis. The second prohibition on assignment of contractual rights forbids assignment when there would be a material change in the duty of the obligor or a material increase of the burden or risk imposed on the obligor. Both of these possibilities are implicated in this case by the assignment of the duty of defense.

{¶ 63} The duty of defense is a more personal and individual right in the case of an assignment. There can be only one recovery for property damage or

personal injury, but when, as here, another insured (Aeroquip–Vickers) has maintained the coverage once held by the original LOF Glass, while Pilkington is making a claim as an *additional* insured, there are now multiple potential parties to defend.

{¶ 64} In a commercial general liability situation, with an assignment of rights notwithstanding an anti-assignment clause, transfer of the right to demand a defense may constitute a material change in the duties of the insurer, who could be obligated to defend multiple parties. It may also constitute a material increase in the insurer's obligations, as the cost of defense in such a circumstance would now almost certainly be higher.

{¶ 65} This was precisely the concern in *Henkel*:

{¶ 66} "If both assignor and assignee were to claim the right to defense, the insurer might effectively be forced to undertake the burden of defending both parties. In view of the potential for such increased burdens, it is reasonable to uphold the insurer's contractual assignment right to accept or reject an assignment." 29 Cal.4th at 945, 129 Cal.Rptr.2d 828, 62 P.3d 69.

{¶ 67} There are, of course, other considerations. In *N. Ins. Co. of New York v. Allied Mut. Ins. Co.* (C.A.9, 1992), 955 F.2d 1353, which involved the question of whether coverage followed liability by operation of law, the insurers contended that they had no duty to defend because of a substitution of one defendant for another. The Ninth Circuit disagreed, holding that it was the "nature of the risk," rather than the characteristics of the individual defendant, that mattered. Id. at 1358.

{¶ 68} The language of the preceding paragraphs is couched in potentials and possibilities, but so, ultimately, is the business of insurance. The insurer accepts the risk of providing coverage based on the representations made by the insured. Rhodes, The Law of Commercial Insurance (1996), 383, Section III.4.1. The insurance policy, by its terms, contemplates defending only the named insured. Being obligated to defend parties other than the named insured may materially increase that risk.

{¶ 69} We note that this increased risk might not occur when the original insured corporation is no longer in existence and is incapable of being sued or of demanding a defense under the original commercial general liability policy. In such a circumstance, the insurer has incurred no increase in obligation, and the rationale for this rule falls away.

{¶ 70} We therefore believe that, after the loss has occurred, an anti-assignment clause in an insurance policy does apply to a claim for defense when the

assignment places upon the insurer a materially changed duty or a materially increased risk.

---

**PFEIFER, J., concurring in part and dissenting in part.**

{¶ 71} A majority of this court today agrees that an insurance policy's indemnification coverage can be transferred post-loss regardless of any anti-assignment clause in the policy. There is a division within that majority as to whether coverage for the costs of a defense may also be so transferred. I would hold that coverage for the cost of a defense, as part of the chose in action, is always freely transferable post-loss.

{¶ 72} The majority's determination that a chose in action (including the rights to indemnity and defense) arises at the time of a covered loss is decisive. As Justice O'Connor writes in her response to Question 2, "insurance policies are generally construed such that assignment of an interest is valid *after* the occurrence of the loss insured against, and the assignment is then regarded as a transfer of the chose in action, even in the face of an anti-assignment provision." (Emphasis sic.) Once a loss has occurred that triggers rights under the policy, what is being transferred is not an interest in the policy, but rather something different, a chose in action. 2 Russ and Segalla, Couch on Insurance (3d Ed.2005), Section 34.25. A chose in action is a freely alienable property interest; thus, what is being transferred is an existing, intangible property right, not an interest in the policy. The policyholder is essentially transferring a cause of action based upon the policy rather than an interest in the policy. "[A]ssignment before loss involves a transfer of a contractual relationship while the assignment after loss is the transfer of a right to a money claim." Id., Section 35:7.

{¶ 73} Since the predecessor here possessed a chose in action, the anti-assignment provisions of the policy are inapplicable. To a great extent, our answers to the questions posed in this case depend on how much we rely on the decision in *Henkel Corp. v. Hartford Acc. & Indemn. Co.* (2003), 29 Cal.4th 934, 129 Cal.Rptr.2d 828, 62 P.3d 69. In *Henkel,* the California Supreme Court determined that *no chose in action existed at the time of the transfer* because in that case the claims for defense and indemnity "had not been reduced to a sum of money due or to become due under the policy" and because the insurers "had not breached any duty to defend or indemnify" the named insured. Id. at 944, 129 Cal.Rptr.2d 828, 62 P.3d 69. That holding of no chose in action was elemental in the court's determination that the rights to indemnity and defense were not transferable. The court held that since those rights were *not* choses in action, they could not be assigned without the insurer's consent. Id.

{¶ 74} Here, this court correctly breaks with *Henkel* on the chose-in-action issue, holding that the rights to indemnity and defense are choses in action. That finding obviates the need for a consideration of the effect of the anti-assignment clause.

{¶ 75} The negation of the anti-assignment clause does not produce an unjust result for the insurer. The idea that an insurer would have to defend both the transferor and the transferee for the same risk is not sound. If the right to a defense has been transferred to a successor, the transferor no longer has that right. The right cannot both be transferred and retained. If some other party asserts a right to a defense, the matter can be resolved through a declaratory judgment action.

{¶ 76} That the successor entity was not a party to the original policy is a phantom problem. Even in the case of a company that has undergone no restructuring, the entity that avails itself of the policy could be much different from the one that purchased the policy. Personnel, management teams, and corporate focus can change in any company. In any case, the focus of the claim will be on the company as it was at the time of the triggering occurrence. As the court wrote in *N. Ins. Co. of New York v. Allied Mut. Ins. Co.* (C.A.9, 1992), 955 F.2d 1353, 1358:

{¶ 77} "The nature of the risk, rather than the particular characteristics of the defendant, will have the greater effect on defense costs. The extent and character of the defense will turn on the nature of the product itself and the attributes of the firm that manufactured the product. Aspects of the successor firm could affect the defense, but the shape of the defense will be determined largely by the characteristics of the risk originally insured. Admittedly, defense costs could balloon if the successor firm failed to cooperate in the defense. Inasmuch as the successor firm was not a party to the original policy, the risk of noncooperation arguably increases. Yet, the insurer is protected against this risk because it is freed of the defense obligation if the successor firm does not fulfill its duty to aid in the defense."

{¶ 78} Requiring courts to determine whether the transfer "places upon the insurer a materially changed duty or a materially increased risk" would protect insurers against a hypothetical problem and would impose an impractical and speculative test. Whether and how an insurer may be harmed is entirely more complex than the question the court should be considering in a fight over coverage: whether and to what extent the coverage was transferred. How will a court determine whether a risk is material or not? Will the court undergo the analysis even when no other potential insureds are seeking coverage? Is the relevant inquiry what the potential other insureds *might* do? Would a ten

percent increase in risk be considered material? Twenty-five percent? If there is an increase in risk, should the result be that no defense is provided at all?

{¶ 79} The better approach is for a court to determine what was transferred when the chose in action was transferred. If the transfer itself somehow causes an increased risk for the insurer—if the risk is more than was bargained for between the insurer and the original insured—then the insurer should not be responsible for that increased risk. However, it should remain liable for what it did bargain for—the full extent of the coverage that would have applied to the original insured.

{¶ 80} Separating indemnification from defense costs within the chose in action is inconsistent. Both aspects of the coverage are a part of the transferred chose in action. Further, practical injustices result from such an approach. If indemnification coverage is freely transferable, but the costs of defense are not, any defense provided by the successor ultimately inures to the benefit of the insurer. Not only would the insurer not provide a defense, it would benefit from the defense the successor provides for itself. On the other hand, from the insurer's perspective, even though the insurer remains liable for a large judgment through indemnity, it is powerless to direct the defense.

{¶ 81} Ultimately, the most damaging aspect of this court's failure to find an absolute right to the transferability of a chose in action is its effect on economic activity. The continuity of liability coverage is especially important in manufacturing. Ohio is a manufacturing state, ranking second among the 50 states in total manufacturing jobs. As of 2004, over 780,000 Ohioans held jobs in manufacturing. U.S. Census Bureau, 2004 Annual Survey of Manufactures, Geographic Area Statistics, Statistics for All Manufacturing by State, available at http://factfinder.census.gov/servlet/IBQTable?_bm=y&-_bm=y&-ds_name= AM0431AS101. We still make things here; Ohioans do not spend their work hours selling insurance to each other. The manufacturing process can be dirty and dangerous, and our society's willingness to accept the negative by-products of the manufacturing process changes over time. A manufacturer must realize that the accepted practices it is engaged in today may become the basis of tort recovery or government-imposed cleanup later. An insurer also signs on for that. And the insurer's role in providing coverage for former wrongs is a very important one for long-term economic activity. The predictability of liability coverage is essential for businesses to move forward. The rule of post-loss assignment has played an important role in our economy:

{¶ 82} "[A] major rationale for commercial insurance is to facilitate economic activity and growth by providing risk management protection for economic actors. * * * In the modern American economy, mergers, acquisitions, and sales are part of corporate life. For the most part, economists approve of this activity

because it allows the marketplace to allocate resources to their most profitable uses. To the extent that insurance protection (for past but possibly unknown losses) may be more freely assigned as part of corporate recombinations, this lowers transaction costs and facilitates economic activity and wealth enhancement. Consequently, the general rule permitting post-loss assignment is a good rule—which is why the courts have crafted it over the years even though it appears to contradict the clear text of many insurance policies and the courts' expressed fidelity to contract language. The post-loss exception to the general rule of restricted insurance assignability is a venerable rule borne [sic] of experience and practicality." 1 Stempel, Law of Insurance Contract Disputes (2d Ed., 1999 Supp.2004), Section 3.15[d].

{¶ 83} We should not replace a "venerable rule" born of "experience and practicality" with a new rule born of speculation and impracticality. Ohio law should allow post-loss assignment of insurance benefits for both indemnity and defense costs. The right to a defense under an insurance policy is a crucial right, and this court's decision—or indecision—puts that right in doubt in countless cases where corporations have restructured, reorganized, or sold assets.

{¶ 84} As for Question 3: In this case, there was a valid, direct assignment of assets and liabilities to the successor entity. But corporate succession is often more labyrinthal or fractured. The third question posed herein asks whether the assignment of insurance benefits follows by operation of law whenever liabilities are transferred between entities. I would hold that "a corporation which succeeds to liability for pre-acquisition operations of another entity acquires rights of coverage by operation of law." *Glidden Co. v. Lumbermens Mut. Cas. Co.*, Cuyahoga App. No. 81782, 2004-Ohio-6922, 2004 WL 2931019, ¶ 64. My reasoning for that holding is more fully set forth in my dissenting opinion in *Glidden Co. v. Lumbermens Mut. Cas. Co.*, 112 Ohio St.3d 470, 2006-Ohio-6553, 861 N.E.2d 109, 2006 WL 3743025.

RESNICK, J., concurs in the foregoing opinion.

---

**LANZINGER, J., concurring in part and dissenting in part.**

{¶ 85} Because I disagree fundamentally with the lead opinion's analysis as to the first certified question, I respectfully dissent and would answer that question as follows: Pilkington's demand for defense and indemnification is not a chose in action.

{¶ 86} After accepting the characterization of Pilkington's demands for defense and indemnity as a "chose in action" and holding that the chose arises at the time of the "covered loss," the lead opinion holds that a nonparty to an insurance contract may avoid an anti-assignment clause and be indemnified and potentially

defended under the policy. Such holdings that extend insurance coverage contrary to the contracting parties' express consent erode the freedom of contract and may have significant consequences for insurers and insureds alike. I would hold that a policyholder's right to defense and indemnity under a third-party liability insurance policy is not, by itself, a chose in action that may be transferred without insurer consent despite an anti-assignment clause.

{¶ 87} This is not a case of insurers who obtain a windfall through insurance forfeiture. No one disputes that Libbey–Owens–Ford Glass Company ("LOF"), now known as Aeroquip Vickers, Inc. ("Aeroquip") currently owns the general liability policies covering LOF's glass-manufacturing business before Pilkington's acquisition and that Aeroquip itself has pending claims[3] for coverage under these policies. Nor is it disputed that anti-assignment clauses prevent the unilateral transfer of "interest" in the policies and that Pilkington was not assigned the policies or added as a named insured. Yet despite being a nonparty to the contracts and unnamed as an insured, Pilkington seeks insurance defense and indemnity for environmental liabilities arising from LOF's previous activity. Pilkington argues that it has a chose in action or, in the alternative, that insurance coverage should transfer to it by operation of law.

## Chose in Action

{¶ 88} A "chose in action" is defined generally as a "a proprietary right in personam." Black's Law Dictionary (8th Ed.2004) 258. We explained, in an early case allowing a judgment creditor to reach the debtor's unliquidated property-damage claim against a third party, that the term "chose in action" may apply to the right to bring an action in tort and in contract: "[W]hile * * * a 'chose in action' is ordinarily understood [to be] *a right of action for money arising under contract,* the term is undoubtedly of much broader significance, and includes the right to recover pecuniary damages for a wrong inflicted either upon the person or property. It embraces demands arising out of a tort, as well as causes of action *originating in the breach of a contract.*" (Emphasis added.) *Cincinnati v. Hafer* (1892), 49 Ohio St. 60, 65, 30 N.E. 197.

{¶ 89} This concept is misconstrued in the lead opinion when it tries to pinpoint when a chose in action becomes enforceable in the insurance context. A chose in action *is already* an accrued right, not a mere expectancy that later ripens or becomes enforceable. As expressed in *Hafer,* a chose in action arises when money is due under the contract or there is a breach of a contract leading to a cause of action. The lead opinion, however, states that a chose in action arises at the time of a covered loss and cites for this proposition a case involving the

---

3. A declaratory judgment action for asbestos-related coverage under the same policies is pending in the Common Pleas Court of Lucas County, Ohio, No. CI0200304077.

probate disposition of a contested but fixed sum of insurance proceeds due to a casualty loss. *In re Estate of Ray,* 6th Dist. No. WD–02–049, 2003-Ohio-2001, 2003 WL 1904412. But *Ray* is distinguishable because the chose in action arose under the casualty policy upon the property damage when the owner had the right to receive insurance proceeds directly. In contrast, in the general commercial liability policies here, the insurers have agreed to defend and indemnify Aeroquip against claims brought by third parties for LOF's activities during a stated period of coverage.

{¶ 90} By asserting that a chose in action is created upon a "covered loss," the lead opinion allows Pilkington to avoid the anti-assignment clause and obtain the benefits of the insurance contracts. It relies on an exception to the general rule: "While the general rule regards liability and indemnity policies as non-assignable personal contracts, assignment is valid following occurrence of the loss insured against and is then regarded as chose in action rather than transfer of actual policy." 2 Russ & Segalla, Couch on Insurance (3d Ed.2005), Section 34:25.

{¶ 91} The cases in which assignment happens after the occurrence of "the loss insured against" usually involve transfer of rights from the insured to an injured third party. For example, an insured employer, sued for intentional tort, who eventually settled and assigned its rights to collect the settlement amount under the company's policy to the injured employee, did so without contravening the anti-assignment provision because the court construed the clause as prohibiting assignment of the policy rather than an accrued claim. *Fiorentino v. Lightning Rod Mut. Ins. Co.* (1996), 114 Ohio App.3d 188, 194–195, 682 N.E.2d 1099. The anti-assignment clauses here are broader and refer to an "interest," which includes a chose in action.

{¶ 92} To determine whether Pilkington's demand constitutes a chose in action, I would instead ask whether a sum is due or whether the insurer has breached its obligation to the insured, applying the reasoning of *Henkel Corp. v. Hartford Acc. & Indemn. Co.* (2003), 29 Cal.4th 934, 129 Cal.Rptr.2d 828, 62 P.3d 69. In *Henkel,* the California Supreme Court rejected a successor corporation's attempt to avoid a consent-to-assignment clause when the event giving rise to the liability occurred prior to the assignment. The court reasoned that at the time of the unilateral assignment, the insurers' duty to defend and indemnify had not accrued because the "claims had not been reduced to a sum of money due or to become due under the policy [and the insurers] had not breached any duty to defend or indemnify [the predecessor corporation]." Id. at 944, 129 Cal.Rptr.2d 828, 62 P.3d 69.

{¶ 93} *Henkel's* reasoning was later adopted in a case in which the acquiring company sought to avoid the consent-to-assignment provision because the loss (i.e., pollutants allegedly causing environmental damage being released on the

property) had already occurred. *Century Indemn. Co. v. Aero–Motive Co.* (W.D.Mich.2003), 318 F.Supp.2d 530, 539. The court also determined that at the time of the purported assignment, the selling company did not have a claim or accrued cause of action under the policies to assign, because even if a discharge of pollutants had occurred before the assignment, the damages associated with the environmental cleanup were not assessed until almost two decades later. Id. at 540. Because no claim had been made against the seller at the time of the transfer, the seller had no claim against its insurers for defense or indemnification under the policies. Id.

{¶ 94} Similarly, when LOF transferred certain liabilities and assets to LOF Glass, Inc., which Pilkington voluntarily acquired when it purchased all the shares of LOF Glass, Inc. in 1986, LOF did not have any accrued rights against its insurers. LOF had no outstanding judgment that the insurers were required to pay on its behalf and had not been refused any defense. All LOF had were the policies themselves, which were not part of the transfer. Thus, a chose in action was never created by the time of the 1986 transfer because no sum was due, and the insurance companies had not breached any duty owed to LOF.[4]

{¶ 95} Unless or until there is such a breach of the insurance contract, there is no accrued right under the policy, whether it be called "chose in action" or not. Accordingly, I would hold that Pilkington's demand does not constitute a chose in action.

### Anti-assignment Clause

{¶ 96} All of the policies contain language prohibiting the assignment of "interest" under the policy without the insurers' consent. This prohibition appears simple enough. If there is no chose in action, there is nothing to assign. As the district court observed in its order of certification to this court, if the "answer to [the first] question is 'no,' it is not necessary to answer Question Two."

### Transfer by "Operation of Law"

{¶ 97} The general rule of successor liability states that the purchaser of a corporation's assets is not liable for the torts of the seller corporation. *Flaugher v. Cone Automatic Mach. Co.* (1987), 30 Ohio St.3d 60, 30 OBR 165, 507 N.E.2d 331. The exceptions to the rule are inapplicable here, and the lead opinion properly rejects the premise of *N. Ins. Co. of New York v. Allied Mut. Ins. Co.* (C.A.9, 1992), 955 F.2d 1353, because Ohio does not accept the product-line

---

4. Of course the insurers continue to owe the duties of defense and indemnification to the insured policyholder, now known as Aeroquip, which retains the capability of suing the insurers for amounts up to policy limits if it is refused a proper defense or if it is not indemnified after being found liable for property damage or personal injury as a result of LOF's previous operations.

successor liability theory. In this case, Pilkington's potential liability arises from its 1986 share exchange agreement with LOF.

{¶ 98} I believe that the contractual obligation defines the relationship between the parties when the liability arises as a matter of contract. *Red Arrow Prods. Co., Inc. v. Emps. Ins. of Wausau* (App.2000), 233 Wis.2d 114, 132–134, 607 N.W.2d 294; *Gen. Acc. Ins. Co. v. Alameda Cty. Super. Court* (1997), 55 Cal.App. 4th 1444, 1454–1455, 64 Cal.Rptr.2d 781; *Quemetco, Inc. v. Pacific Auto. Ins. Co.* (1994), 24 Cal.App.4th 494, 500–503, 29 Cal.Rptr.2d 627.

{¶ 99} Insurance is a contract between the insurer and the insured. *Ohayon v. Safeco Ins. Co. of Illinois* (2001), 91 Ohio St.3d 474, 478, 747 N.E.2d 206. In the context of an asset sale, terms of insurance coverage may be the subject of bargaining. For example, a seller may wish to preserve its insurance coverage limits entirely, a buyer may seek the insurer's consent to have coverage assigned, or the parties may enter into indemnification agreements. The parties may creatively agree to control their own liability. The insurers here contracted to insure a particular company, LOF, against environmental damage as a result of the glass-manufacturing operations. The contract specified that the insurers must consent before an "interest" could be assigned. The parties' agreements should stand as negotiated.

{¶ 100} Therefore, I concur to the extent that the lead opinion holds that a transfer of insurance benefits does not arise by operation of law when liabilities are imposed voluntarily by contract. I respectfully dissent as to the answer to certified question one and the need to answer question two.

Lundberg Stratton and O'Donnell, JJ., concur in the foregoing opinion.

---

Connelly, Jackson & Collier, L.L.P., Steven R. Smith, and Tammy Geiger Lavalette; Covington & Burling, Mitchell F. Dolin, Seth A. Tucker, and Ann–Kelley Kemper, for petitioner.

Amelia A. Bower; Plunkett & Cooney, P.C., Kenneth C. Newa, and Mary Massaron Ross; Manahan, Pietrykowski, Bamman & Delaney and Stephen E. House, for respondent Liberty Mutual Insurance Company.

Gibson, Dunn & Crutcher, L.L.P., Gary L. Justice, and Andrew Z. Edelstein; Hahn Loeser & Parks, L.L.P., and Arthur M. Kaufman, for respondent Travelers Casualty & Surety Company.

Kirkpatrick & Lockhart Nicholson Graham, L.L.P., Thomas E. Bisric, and James E. Scheuermann; Cooper & Walinski, L.P.A., Joseph P. Thacker, and John K. Nelson, for respondents Aeroquip–Vickers, Inc. and Eaton Corporation.

McCarthy, Lebit, Crystal & Liffman Co., L.P.A., David A. Schaefer, and Charles P. Royer; White & Williams, L.L.P., Patricia B. Santelle, Peter Rosen-

thal, and Joseph M. Kuffler, for respondents OneBeacon America Insurance Company and Northern Assurance Company of America, Inc.

Goodman Weiss Miller, L.L.P., Drew A. Carson, and Sarah H. Kostura, in support of petitioner for amicus curiae, United Policyholders.

Allen, Kuehnle & Stovall, L.L.P., Lisa L. Norris, and Thomas R. Allen; Wiley, Rein & Fielding, Laura A. Foggan, and Alicia C. Ritter, in support of respondents for amicus curiae, Complex Insurance Claims Litigation Association.