# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
MAHONING COUNTY

JEREMY KAPPER,

Plaintiff-Appellee,

v.

VALANTINE ROOFING AND HOME REMODELING INC.,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 25 MA 0060**

---

Civil Appeal from the
Mahoning County Court No. 5 of Mahoning County, Ohio
Case No. 2025 CV I 00063 CNF

**BEFORE:**
Katelyn Dickey, Cheryl L. Waite, Carol Ann Robb, Judges.

---

**JUDGMENT:**
Affirmed.

---

Jeremy Kapper, Plaintiff-Appellee and

Valantine Roofing and Home Remodeling Inc., Defendant-Appellant.

Dated: January 13, 2026

**DICKEY, J.**

**{¶1}** Appellant, Valantine Roofing and Home Remodeling Inc., appeals the May 23, 2025 judgment entry of the Mahoning County Court No. 5, awarding damages in the amount of $6,000 to Appellee, Jeremy Kapper, acting pro se, on his claims for breach of contract and failure to honor an express warranty in violation of the Consumer Sales Practices Act, R.C. 1345.01 et seq. ("CSPA") following a bench trial. Appellant's claims are predicated upon a roofing installation contract ("contract") containing a "[t]en-year labor warranty," which was executed in 2022 by Appellant and the previous owner of Appellee's residence.

**{¶2}** Appellant advances two assignments of error. First, Appellant contends the trial court erred as a matter of law as the CSPA specifically exempts home improvement service contracts from the definition of "consumer transactions," and the warranty provisions apply solely to goods not services. Second, Appellant asserts Appellee failed to prove the contract was assignable, the contract was assigned, and Appellant's actions constituted a breach of the contract and a breach of an express warranty in violation of the CSPA. Finding no reversible error, we affirm.

## STANDARD OF REVIEW

**{¶3}** Small claims divisions of county and municipal courts are established pursuant to R.C. 1925 et seq. ("small claims courts"). Small claims courts have limited civil jurisdiction, primarily for the recovery of money damages in amounts not to exceed $6,000. R.C. 1925.02(A)(1).

**{¶4}** "[B]y design, proceedings in small claims courts are informal and geared to allowing individuals to resolve uncomplicated disputes quickly and inexpensively. Pro se activity is assumed and encouraged." *Cleveland Bar Assn. v. Pearlman*, 2005-Ohio-4107, ¶ 15.

**{¶5}** Pursuant to Evid.R. 101(D)(8), the Ohio Rules of Evidence are inapplicable in proceedings held in the small claims court. The Staff Notes for Evid.R. 101(D)(8) read in relevant part:

This subsection excludes small claims proceedings from the rules of evidence although such proceedings are ordinarily adversary in nature. The Evidence Rules Advisory Committee did recognize that R.C. Ch. 1925, governing small claims divisions, does not actually by statute exclude proceedings from the formal rules of evidence although the Chapter does provide for "conciliation procedures" (R.C. 1925.03), and on many occasions referees as "a practical matter" ignore rules of evidence in order to resolve a dispute. Referees obviously require some reliable evidence to prove a claim, but a referee, exercising some discretion, should not deny a layman justice through a formalistic application of the law of evidence. A small claims division is intended as a layman's forum.

*N. Star Med. Research, LLC v. Kozlovich*, 2025-Ohio-5410, ¶ 45 (8th Dist.) (quoting staff notes).

**{¶6}** We have acknowledged small claims courts are considered a "layman's forum" and a party should not be denied justice through a formalistic application of the laws of evidence. *Watkins v. Alwishah*, 2021-Ohio-3589, ¶ 29 (7th Dist). Nonetheless, "some reliable evidence must be presented in order for a party to prove his or her claim." *Id.*, *see also Karnofel v. Nye*, 2016-Ohio-3406, ¶ 19 (11th Dist.); *Lauderbaugh v. Gellasch*, 2006-Ohio-2877, ¶ 7 (8th Dist.) (applying the "some reliable evidence" standard in small claims courts).

**{¶7}** When reviewing civil appeals from bench trials, an appellate court applies a manifest weight standard of review. *Id.*, citing App.R. 12(C), *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77 (1984). Judgments supported by some competent, credible evidence going to all the material elements of the case must not be reversed as being against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Const. Co.*, 54 Ohio St.2d 279 (1978), syllabus. *See also Gerijo, Inc. v. Fairfield*, 70 Ohio St.3d 223, 226 (1994). Reviewing courts must oblige every reasonable presumption in favor of the lower court's judgment and finding of facts. *Gerijo*, 70 Ohio St.3d at 226 (citing *Seasons Coal Co.*, *supra*). If the evidence is susceptible to more than one interpretation, then the reviewing court must construe the evidence consistently with the lower court's judgment.

*Id.* In addition, the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts. *Kalain v. Smith*, 25 Ohio St.3d 157, 162 (1986). However, statutory interpretation is a question of law to be reviewed de novo. *Richmond Mills, Inc. v. Ferraro*, 2019-Ohio-5249, ¶ 29 (7th Dist.).

### FACTS AND PROCEDURAL HISTORY

**{¶8}** The following facts are taken from the bench trial conducted on April 18, 2025. Two witnesses testified at the bench trial – Appellee, who was acting pro se, and Edward Valantine, who testified on behalf of Appellant. Valantine and his wife are the shareholders of Appellant. The trial court admitted all of Appellee's exhibits without objection. Appellant offered no exhibits. For clarity it is important to note that the residence at issue in this appeal has two chimneys, a three-port masonry chimney and an aluminum chimney.

**{¶9}** On November 29, 2021, Appellant and Rachael Thomas ("previous owner") executed the contract for the installation of a new roof for the residence at 1161 Shawnee Trail in Youngstown, Ohio. The contract is marked "paid in full 3-14-22," and establishes a purchase price of $18,727.09. The typewritten portion of the contract reads in relevant part, "Install: Limited lifetime fiber glass asphalt dimensional shingles . . . [t]en year labor warranty."

**{¶10}** The form portion of the contract reads in relevant part, "All material is guaranteed as specified. All work to be competed in a workmanlike manner according to standard practices."

**{¶11}** Appellee testified he purchased 1161 Shawnee Trail on October 6, 2023. Appellee telephoned Valantine in March or April of 2024 and reported "the [three-port masonry] chimney's, you know, leaking severely." (Trial Tr., p. 6.) Valantine was "super nice," and said "I'll have someone come out and fix it." (*Id.* at p. 6-7.)

**{¶12}** Appellee further testified:

> They came out and didn't quite do the fixing on it. And one of the employees stated that it was improperly done to begin with, that it was a default on them, and there was a bunch of water damage in the garage from

a mold. So he was like, oh, yeah. He was like, my dad's the manager. He was like, I'll make sure it gets done. They won't be able to come out today, but probably tomorrow, you know,

And after that, pretty much [Valantine] went ghost on me or wouldn't respond to me. I asked for his insurance information, and he wouldn't provide it, said he doesn't have to. But I thought he did, since he had people on my roof, and I've, obviously pictures of it and different evidence to [ ] corroborate with that.

(*Id.* at p. 7.)

{¶13} According to the complaint, which was read into the record in relevant part by the trial court, Appellee requested $6,000 in damages for "mold mitigation caused by faulty work, drywall, paint – drywall repair,[ ] paint, chimney flashing repair and wood repair in the attic." (*Id.* at p. 8.) The trial court admitted into evidence an estimate from Quality Power Wash, which also established some electrical work (the replacement of a light switch) was required as well. (*Id.* at p. 9.) Specifically, the estimate, which was admitted into the record, reads:

1) Chimney-front of home; flashing repair/replace (water intrusion) (3 port chimney) and seal. [$1,675]

2) Dry wall/plaster repair (garage), mold present, 1 outlet, from water damage from main 3-port chimney leak. [$4,300]

3) Wood repair/treat damages wood with mold treatment from water intrusion from 3-port chimney, above drywall/plaster in garage. [$375]

4) Single port chimney in rear of home, chimney apron pulling up from roof shingles, poor installation. [$425]

With a $200 charge for trash removal, the total cost of the repairs is $6,975.

{¶14} A photograph, identified as Exhibit 6, depicted the three-port masonry chimney with both original and new caulking securing the flashing. Exhibit 6, in addition

to other photographs in the record, established the flashing was installed on top of the shingles.

{¶15} Appellee testified, "there's plenty of literature out there stating that you don't lay [flashing] on top, that it's the least, you know, standard method to use." (*Id.* at p. 11.) The trial court admitted a document from "Rainstoppers Roofing," which reads flashing properly secured by caulking typically requires replacement (depending on the quality of the flashing) between fifteen or less years (low grade flashing) and twenty or thirty years (higher grade material). Proper installation is key to prevent premature failures such as leaks or gaps. Water stains on the ceiling near the chimney or peeling paint may indicate leaks caused by faulty flashing.

{¶16} A second document, captioned "Chimney & Sidewall Flashings," bearing the insignia, "Heney," and explaining sections of the International Residential Code ("IRC") reads, "[t]here are very specific requirements for flashing around the chimney and along sidewalls such as on side of a dormer."  Under the caption, "Asphalt Shingle Roofing," the document reads:

> 2015 IRC R 905.2.8.3:  Base flashing against a sidewall (or chimney) shall be continuous or step flashing and shall be not less than 4" in height and 4" in width and shall direct water away from the vertical sidewall (or chimney) onto the roof or into the gutter. . . . Where the vertical siding is masonry, base flashing (i.e., step flashing) and counter flashing shall be provided.

{¶17} A third document captioned, "Can you put flashing over shingles on the roof?" reads in relevant part, "[t]ypically flashing is installed beneath the shingles, allowing it to direct water away from vulnerable areas."  The document recognizes convenience and aesthetic appeal are advantages of installing flashing over shingles, but identifies an increased risk of leaks and decreased longevity.

{¶18} The trial court asked Appellee to identify the contract for the record, and Appellee responded, "[t]he prior homeowner [ ] gave – gave [Appellee and his wife] that with the purchase of the house to show the [ ] new roof work." (Trial Tr.*,* p. 9)  The trial

Case No. 25 MA 0060

court admitted numerous photographs into evidence, which depicted "poor workmanship in general," according to Appellee, including exposed and lifted nails. (*Id.* at p. 10)

**{¶19}** On cross-examination, Appellee conceded he had only a layman's understanding of roof installation and a home inspection was completed on the residence prior to the purchase date. He explained only a partial roof inspection was undertaken, due to snow coverage. (*Id.* at p. 16.) Appellee further conceded he did not know when the damage to the residence occurred, the leak from the three-port masonry chimney has not reoccurred since the additional caulk was applied, and he did not know whether there was flashing under the shingles on the aluminum chimney.

**{¶20}** Valantine testified Appellant's business includes the installation of "roofing, shingles, flat roof, metal roof, sidings, gutters, [and] chimney repairs." (*Id.* at p. 23.) Although Appellant performs some commercial and industrial work, the majority of its business is residential. Appellant services roughly 150 roofs annually.

**{¶21}** Valantine explained, "[w]e give a – we give a ten-year labor and material warranty with the homeowner. And the shingles are warrantied – a limited warranty for life, and it's one-time transferrable, but it's only on the shingles through Owens Corning. The labor is not transferrable." (*Id.* at p. 24.)

**{¶22}** Valantine conceded he sent a crew to examine the roof, but did not "recall 100 percent what was told to [him] at the time." (*Id.* at p. 25.) He was likewise unaware that any repairs were performed on the roof. He had no personal knowledge of the additional caulking applied by the crew. (*Id.* at p. 26.)

**{¶23}** According to Valantine, Appellant made the "necessary repairs" out of "generosity", but the "interior damage is on the current homeowner." (*Id.* at p. 25.) Valantine testified he provided the foregoing information to Appellee in an electronic mail exchange that was admitted into evidence.

**{¶24}** Valantine provided the following explanation regarding the installation of the counter flashing on the three-port masonry chimney:

> Well, typically what we do is we strip everything down to the wood.
> We install ice and water shield around the chimney. We install the shingles,
> and with step flashing with each shingle we put down. And then we put a
> counter flashing around that to keep the water out.

(*Id.* at p. 26.)

**{¶25}** With respect to the other chimney, Valantine testified, "[t]he aluminum chimney kit has a – a flashing base that goes down, and then the aluminum chimney kit sets over top of that, and then you caulk around the two sides and the back." (*Id.* at p. 28.) Valantine's testimony was predicated exclusively upon the photographs admitted into evidence, as it does not appear from the record that he inspected the roof at issue, either immediately following installation or after Appellee complained of the leak.

**{¶26}** Based on Valantine's education, training, and experience, he testified the installation of the counter flashing meets the standard in the industry. (*Id.* at p. 27.) He further testified he did not know the cause of the water issues or when they occurred.

**{¶27}** The trial court entered judgment in the amount of $6,975, reduced to the jurisdictional statutory maximum of $6,000, in favor of Appellee on his breach of contract and CSPA claims, citing the estimate for repairs in the record. This timely appeal followed.

**{¶28}** Appellant argues the trial court erred as a matter of law as the CSPA specifically exempts home improvement services contracts from the definition of "consumer transactions," and the warranty provisions apply solely to goods not services. Appellant further argues Appellee failed to prove the contract was assignable, the contract was assigned, and Appellant's actions constituted a breach of the contract and a breach of an express warranty in violation of the CSPA.

## ANALYSIS

## ASSIGNMENT OF ERROR NO. 1

**THE TRIAL COURT ERRED IN FINDING THAT THE WARRANTY WAS ASSIGNED TO THE SUBSEQUENT PURCHASER.**

**{¶29}** Appellant advances two arguments with respect to the assignment of the contract in this case. First, Appellant contends the contract prohibited the assignment of the warranty on labor. Second, he asserts Appellee failed to offer evidence establishing he is an assignee of the contract. Appellant also challenges the applicability of the CSPA to the roof installation at issue in this appeal. Although he addresses the application of

Case No. 25 MA 0060

the CSPA under both assignments of error, we address Appellant's textual challenges to the CSPA in their entirety under the first assignment of error.

**{¶30}** Ohio law generally favors the free assignability of contracts absent "clear contractual language prohibiting assignment." *Pilkington N. Am. Inc. v. Travelers Cas. & Sur. Co.*, 112 Ohio St.3d 482, 488 (2006). Assignment is permitted unless it is prohibited by contract, it materially decreases the value or increases the risk, or it is prohibited by statute. *Id.*

**{¶31}** We summarized the relevant law on the assignment of contracts in *Gionino's Pizzeria Inc. v. Reynolds*, 2021-Ohio-1289, (7th Dist.), as follows:

> An assignment is defined as a transfer to another person of the whole of any property or right therein. Black's Law Dictionary (6th Ed. 1990) 119. A valid assignment may be oral or written, and should satisfy the requirements of a contract, i.e., the legality of object, capacity of parties, consideration, and meeting of the minds. 6 Ohio Jurisprudence 3d (2011), Assignments, Section 25. An assignment, no matter how informal, may be found when there is intent on the part of the assignor to assign the rights in question, an intent on the part of the assignee to be assigned the rights in question, and valuable consideration exchanged. *Id.*; see also, *Morris v. George Banning, Inc.* (1947), 77 N.E.2d 372, 374, 49 Ohio Law Abs. 530.
>
> *Acme Co. v. Saunders TopSoil*, 7th Dist. Mahoning No. 10 MA 93, 2011-Ohio-6243, ¶ 82, J. Waite concurring.
>
> Any cause of action arising out of a contract may be assigned. In order to demonstrate a valid and equitable assignment, the court may consider any words or conduct demonstrating a party's intent to assign a right or action, whether there appears to be an intention of the other party to receive the benefit, and whether valuable consideration was given. *Langhals v. Holt Roofing Co.*, 47 Ohio App.3d 114, 116, 547 N.E.2d 401 (6th Dist.1988).

*Id.* at ¶ 32-33.

Case No. 25 MA 0060

**{¶32}** With respect to assignability, the contract reads in relevant part, "[i]nstall: Limited lifetime fiber glass asphalt dimensional shingles" . . . "[t]en year labor warranty." Valantine conceded the foregoing warranties covered both materials and labor, but testified only the materials warranty was assignable. However, there is no language in the contract that limits the assignability of either warranty. Further, the assignment of the contract does not materially decrease the value or increase the risk of the contract, and assignment is not prohibited by statute. Accordingly, we find the contract is assignable.

**{¶33}** As to the evidence offered to demonstrate the actual assignment, Appellee testified "the prior homeowner [ ] gave – gave us [the contract] with the purchase of the house to show . . . the new roof work." (Trial Tr., p. 9.) Consequently, we find there is competent, credible evidence in the record to support the trial court's conclusion that the assignor (the prior owner) demonstrated an intent to assign the contract, the assignee (Appellee) intended to be assigned the contractual rights, and there was an exchange of valuable consideration, as the assignment was part and parcel of the sale of the residence.

**{¶34}** It is important to note, the trial court opined Appellant's efforts to ameliorate the leaks (which Appellant testified were undertaken as a courtesy rather than a bargained-for contractual obligation) demonstrated Appellant's intent to assign the contract. However, the elements of an assignment of a contract in Ohio do not require evidence of Appellant's authorization or acceptance of the assignment. *See Gionino's Pizzeria Inc.,* 2021-Ohio-1289, ¶ 32 (7th Dist.) (elements of assignment are assignor's intent to assign the rights in question, assignee's intent to be assigned the rights, and valuable consideration exchanged). Likewise, Appellant argues "[t]here was no valuable consideration exchanged between Appellant and Appellee." (Appellant's Brf., p. 7.) We find consideration for an assignment is between the assignor and the assignee.

**{¶35}** Accordingly, we find the trial court's conclusions that the contract was assignable and Appellee was the assignee of the contract are supported by competent, credible evidence. We further find Appellant's first assignment of error as it relates to the assignability and the actual assignment of the contract have no merit.

**{¶36}** The Supreme Court of Ohio has observed that the CSPA "prohibits suppliers from committing either unfair or deceptive consumer sales practices or

unconscionable acts or practices as catalogued in R.C. 1345.02 and 1345.03." *Johnson v. Microsoft Corp.*, 2005-Ohio-4985, ¶ 24. The CSPA "[i]n general . . . defines 'unfair or deceptive consumer sales practices' as those that mislead consumers about the nature of the product they are receiving, while 'unconscionable acts or practices' relate to a supplier manipulating a consumer's understanding of the nature of the transaction at issue." *Id.*

{¶37} More specifically, the CSPA prohibits a supplier from committing an unfair or deceptive act or practice in connection with a consumer transaction whether it occurs before, during, or after the transaction. R.C. 1345.02(A). A "supplier" is "a seller, lessor, assignor, franchisor, or other person engaged in the business of effecting or soliciting consumer transactions, whether or not the person deals directly with the consumer." R.C. 1345.01(C). A "consumer" is "a person who engages in a consumer transaction with a supplier." R.C. 1345.01(D). A "consumer transaction" is "a sale, lease, assignment, award by chance, or other transfer of an item of goods, a service, franchise, or an intangible, to an individual for purposes that are primarily personal, family, or household, or solicitation to supply any of these things." R.C. 1345.01(A).

{¶38} "The CSPA 'is a remedial law which is designed to compensate for traditional consumer remedies and so must be liberally construed pursuant to R.C. 1.11.' " *Whitaker v. M.T. Automotive, Inc.*, 2006-Ohio-5481, ¶ 11, quoting *Einhorn v. Ford Motor Co.*, 48 Ohio St.3d 27, 29 (1990). The CSPA was designed to make private enforcement of the statute attractive to consumers who otherwise might not be able to afford or justify the cost of prosecuting an alleged CSPA violation, which, in turn, works to discourage CSPA violations in the first place via the threat of liability for damages and attorney fees. *Whitaker* at ¶ 11, citing *Parker v. I&F Insulation Co., Inc.*, 89 Ohio St.3d 261, 268 (2000).

{¶39} A manufacturer's failure to honor an express warranty can constitute an unfair or deceptive act or practice under CSPA. *Nee v. State Industries, Inc.,* 2013-Ohio-4794, ¶ 51 (8th Dist.), citing *Layne v. McGowen*, 1995 WL 316233, *5–6 (2d Dist. May 24, 1995); *Brown v. Lyons*, 43 Ohio Misc. 14, 19-20 (C.P.1974) ("Failure by a supplier in connection with a consumer transaction to honor express warranties, constitutes deceptive acts and practices in violation of the Ohio Consumer Sales Practices Act.");

R.C. 1345.02(B)(10) (unfair or deceptive act or practice includes supplier's representation that "a consumer transaction involves or does not involve a warranty, a disclaimer of warranties or other rights, remedies, or obligations if the representation is false.")

**{¶40}** Appellant advances two statutory interpretation arguments with respect to the CSPA. First, he argues the provisions of the CSPA exclude home construction service contracts, as defined in R.C. 4722.01, from the definition of a "consumer transaction." Second, he contends the breach of warranty provision applies solely to the sale of goods not services. Appellant cites no case law in support of the foregoing arguments.

**{¶41}** It is axiomatic that statutes mean what they say by their plain language. *State v. Polus*, 2016-Ohio-655, ¶ 7, citing *In re T.R.*, 2008-Ohio-5219, ¶ 8. "If the language [of a statute] is clear and unambiguous, [the court] must apply the statute as written." *Polus*, quoting *In re T.R.*

**{¶42}** R.C. 1345.01(A) reads in its entirety:

As used in sections 1345.01 to 1345.13 of the Revised Code:

(A) "Consumer transaction" means a sale, lease, assignment, award by chance, or other transfer of an item of goods, a service, a franchise, or an intangible, to an individual for purposes that are primarily personal, family, or household, or solicitation to supply any of these things. *"Consumer transaction" does not include* transactions between persons, defined in sections 4905.03 and 5725.01 of the Revised Code, and their customers, except for transactions involving a loan made pursuant to sections 1321.35 to 1321.48 of the Revised Code and transactions in connection with residential mortgages between loan officers, mortgage brokers, or nonbank mortgage lenders and their customers; *transactions involving a home construction service contract as defined in section 4722.01 of the Revised Code*; transactions between certified public accountants or public accountants and their clients; transactions between attorneys, physicians, or dentists and their clients or patients; and

Case No. 25 MA 0060

transactions between veterinarians and their patients that pertain to medical treatment but not ancillary services.

(Emphasis added.)

{¶43} However, R.C. 4722.01 reads in relevant part:

(B) "Home construction service" means the construction of a residential building, including the creation of a new structure and the repair, improvement, remodel, or renovation of an existing structure. . . .

(C) "Home construction service contract" means a contract between an owner and a supplier to perform home construction services, including services rendered based on a cost-plus contract, *for an amount exceeding twenty-five thousand dollars.*

(Emphasis added.)

{¶44} The contract price of $18,727.09 does not exceed the statutorily-required amount. As the contract does not constitute a home construction service contract, as that term is defined by statute, we find the roof replacement at issue in this appeal is a "consumer transaction" governed by the CSPA.

{¶45} R.C. 1345.02, captioned "Unfair or deceptive labor practices," reads in relevant part:

(A) No supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction. Such an unfair or deceptive act or practice by a supplier violates this section whether it occurs before, during, or after the transaction.

(B) Without limiting the scope of division (A) of this section, the act or practice of a supplier in representing any of the following is deceptive:

. . .

Case No. 25 MA 0060

(10) That a consumer transaction involves or does not involve a warranty, a disclaimer of warranties or other rights, remedies, or obligations if the representation is false.

**{¶46}** Appellant argues the trial court's reliance on *Nee v. State Industries, Inc.*, 2013-Ohio-4794 (8th Dist.) was misplaced as the warranty in *Nee* related to goods rather than services.  However, we find Appellant's effort to limit the application of the CSPA to goods in not supported by the plain language of the statute.

**{¶47}** A "consumer transaction" is "a sale, lease, assignment, award by chance, or other transfer of an item of goods, a service, franchise, or an intangible, to an individual for purposes that are primarily personal, family, or household, or solicitation to supply any of these things." R.C. 1345.01(A).  A plain reading of the statute supports the trial court's conclusion that the roof replacement is a "consumer transaction," and Appellant's refusal to perform the repairs pursuant to the labor warranty in the contract constitutes an unfair or deceptive labor practice.

**{¶48}** Accordingly, we find Appellant's first assignment of error as it applies to the text of the CSPA has no merit.  We further find the trial court did not err as a matter of law in concluding Appellant's refusal to repair the roof was a violation of the CSPA.

## ASSIGNMENT OF ERROR NO. 2

**ASSUMING ARGUENDO THAT THE WARRANTY WAS ASSIGNED, [APPELLEE] FAILED TO PROVE BY A PREPONDERANCE OF THE EVIDENCE THAT APPELLANT'S ACTIONS CONSTITUTED A BREACH OF SUCH WARRANTY AND, THEREFORE, THE TRIAL COUT ERRED IN AWARDING DAMAGES TO [APPELLEE].**

**{¶49}** The essential elements of a contract are an offer, acceptance, contractual capacity, consideration, mutual assent, and legality of object and of consideration. *SAI Hosp., Inc. v. RCVV, Inc.*, 2025-Ohio-4596, ¶ 26 (7th Dist.).  In order to prevail on a breach of contract claim, a plaintiff must establish: (1) the existence of a contract; (2) performance under the contract by plaintiff; (3) breach of the contract by the defendant; and (4) damage or loss to the plaintiff.  *Id.*

Case No. 25 MA 0060

{¶50} Appellant argues the manifest weight of the evidence does not support the trial court's entry of judgment on the breach of contract and CSPA claims. First, Appellant contends the defects in the roof were obvious, and Appellant should have been aware of the defects based on an inspection of the roof prior to the sale. In advancing his caveat emptor argument, Appellant contends we should take judicial notice of the fact that there was no snow in October of 2023, and reject Appellee's explanation that the inspection was incomplete due to snow on the roof.

{¶51} However, the doctrine of "caveat emptor" protects the previous owner of the residence not Appellant. The trial court found the assignment of the contract was part and parcel of the sale of the residence. In other words, even assuming arguendo knowledge of the defects prior to the sale should be imputed to Appellee, he believed any defect would be ameliorated at no charge by Appellant pursuant to the contract.

{¶52} Next, Appellant contends "[i]t is complete speculation as to whether or not any damage occurred between October 2023, the date of closing, and May 2024, when [Appellee] detected problems that could have been due to natural elements, i.e., weather, ice, wind, etc., and not Appellant's labor." (Appellant's Brf., p. 9.) We find whether the damage occurred between October 2023 and May 2024 is irrelevant. Even if the damage predated the sale of the residence, it has no impact on Appellant's contractual duty to repair the roof because it is still within the ten-year warranty timeframe. Evidence of Appellant's breach is addressed below.

{¶53} Third, Appellant writes, "[i]t is unclear if Appellee's claims are for breach of an express warranty or breach of an implied warranty for failure to perform the work in a workmanlike manner." *Id.* However, Appellant offers no distinction with respect to the proper legal analysis.

{¶54} The contract reads in relevant part "[a]ll work to be performed in a workmanlike manner according to standard practices." Generally, "[t]he duty to perform in a workmanlike manner is imposed by common law upon builders and contractors." *Velotta v. Leo Petronzio Landscaping, Inc.*, 69 Ohio St.2d 376 (1982). However, where the duty to perform in a workmanlike manner is included in the express language of a contract, the duty arises out of contract if not performed. *Kishmarton v. William Bailey Constr., Inc.*, 93 Ohio St.3d 226, 228-229 (2001) ("[Where] the contract governs the

warranty of good workmanship . . . the warranty of good workmanship arises from the contract. It can hardly be otherwise.")

**{¶55}** Finally, Appellant contends Appellee offered no evidence of "defective work, no expert testimony establishing any connection, or other potential causes." (Appellant's Brf., p. 9.) Given the relaxed evidentiary standard in small claims court, we find Appellant was not required to offer expert testimony on the cause of the leaking roof.

**{¶56}** Appellee offered evidence the flashing was incorrectly installed based on the estimate, the documents admitted into evidence, and the statements of the crew member sent to inspect the leaking roof. Moreover, the roof was relatively new and there was no evidence offered to explain any alternative cause for the leak.

**{¶57}** During his testimony, Valantine conceded the caulking was a "necessary" repair and did not dispute the damage to the roof and garage was the result of the leak in the three-port masonry chimney. During his direct examination, he summarily testified the roof was installed in a workmanlike manner, which the trial court may have discounted as self-serving and unsupported by his remaining testimony. Further, Valantine's testimony established Appellant's "typical[ ]" method of installing flashing, but did not specifically address the installation of the flashing in this case. Valantine offered no testimony regarding the repairs listed in the estimate.

**{¶58}** A reviewing court is obliged to construe conflicting evidence consistently with the lower court's judgment. Further, the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts. Given the limited scope of our review, we conclude there is competent, credible evidence supporting the judgment entry awarding maximum statutory damages on Appellee's breach of contract and CSPA claims.

## CONCLUSION

**{¶59}** For the foregoing reasons, Appellant's assignments of error are not well-taken. Accordingly, the May 23, 2025 judgment entry of the trial court awarding maximum statutory damages to Appellee on his breach of contract and CSPA claims is affirmed.

Case No. 25 MA 0060

Waite, P.J., concurs.

Robb, J., concurs.

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Mahoning County Court No. 5 of Mahoning County, Ohio, is affirmed. Costs to be taxed against the Appellant.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**